# Supreme Court of Florida

_____

No. SC14-1949
_____

**MICHAEL L. KING,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[January 26, 2017]

PER CURIAM.

This case is before the Court on appeal from an order denying Appellant

Michael L. King's motion to vacate a judgment of conviction of first-degree

murder and a sentence of death under Florida Rule of Criminal Procedure 3.851.

We have jurisdiction of the appeal under article V, section 3(b)(1), Florida

Constitution. For the reasons expressed below, we affirm the circuit court's denial

of relief on all claims. We also conclude that King is not entitled to relief pursuant

to the decision of the United States Supreme Court in Hurst v. Florida (Hurst v.

Florida), 136 S. Ct. 616 (2016).

# FACTS

## Trial and Direct Appeal

King was sentenced to death for the 2008 murder of Denise Amber Lee. King v. State, 89 So. 3d 209, 212 (Fla. 2012). This Court detailed the facts of the murder and subsequent trial in King's initial appeal:

> [O]n January 17, 2008, at approximately 3:30 p.m., Nathan Lee returned to his home on Latour Avenue in North Port, Florida, to find his wife, Denise Amber Lee, missing. The doors were locked, but her keys, purse, and cellular telephone were in the house. The couple's two sons, ages six and two months, were in a crib together, which was not typical. At around 4 p.m. that day, Detective Chris Morales of the North Port Police Department was notified that Denise Lee was missing. When Morales responded to the home on Latour Avenue, he found no signs of forced entry or a struggle, and the children were unharmed.
>
> Earlier that day, between 1 and 2 p.m., a neighbor of the Lees was watching television from a position which provided a view of the street. During that time, she saw a green Camaro "creeping up and down my road going very slow." The Camaro had a black "car bra," which is a leather or vinyl casing across the front of the car which protects against impact from insects or rocks. The neighbor observed the car circle the street four or five times. When the neighbor walked outside to investigate because the driver appeared to be lost, the car pulled into the Lees' driveway. The neighbor made eye contact with the driver but, believing that the operator of the vehicle had found the residence he was looking for, she returned to her house. Ten or fifteen minutes later, the neighbor again stepped outside and saw the Camaro depart from the Lees' residence. The neighbor did not observe Denise Lee entering or being forced into the Camaro.
>
> Later that day, between the hours of 5:30 and 6 p.m., Michael King unexpectedly arrived at the home of his cousin, Harold Muxlow. King was wearing a white shirt with a design. King asked Muxlow for a flashlight, a gas can, and a shovel, explaining that his lawnmower was stuck in his front yard. After Muxlow provided King the tools, King immediately left. As Muxlow was walking back to his

house, he heard a female voice from the vehicle exclaim, "Call the cops." Muxlow turned around and walked down the driveway toward King, asking what he was doing. King lifted his head from beside the passenger side of the car and replied, "Nothing, don't worry about it." Muxlow initially turned and began to walk toward his house but, curious, he turned around once again and walked to the edge of the street toward the car. There, he saw King crawling over the console in the Camaro and pushing the head of a person with shoulder-length hair down in the back seat. He also observed part of the person's knee rise up. King then climbed into the driver's seat and drove away.

Thinking the incident was suspicious, Muxlow drove to King's residence to investigate if King had returned and whether a lawnmower was in fact stuck in the yard. When Muxlow arrived, he found neither King's green Camaro nor a lawnmower in King's yard. Muxlow placed an anonymous 911 phone call in which he provided a description of King's vehicle and informed the dispatcher that a person might be in the described vehicle against her will.

At 6:14 p.m., the Sarasota County Sherriff's Office received another 911 call. During trial, the parties stipulated that the female voice on this 911 call was that of Denise Lee. Harold Muxlow testified that a second, male voice also present on the 911 recording was that of his cousin, Michael King. The recording of the 911 call presented during trial was transcribed by the court reporter as follows: [n.1]

> [n.1] . . . Due to the absence of the [complete] transcript, the text of the call is derived from the transcription of the court reporter and an audio recording of the 911 call that was included as part of the record on appeal. Brackets indicate words that the Court could hear but were not fully understood or transcribed by the court reporter.

DISPATCHER: 911.

[LEE: I'm sorry. I'm sorry. I just want to go—]

DISPATCHER: Hello?

[LEE: I'm sorry. I just want to see my family.]

MALE VOICE: Why did you do that?

LEE:  I'm sorry.  [I just want to see my family.]

DISPATCHER:  Hello?

LEE:  I just want to see my family again.  Please.

DISPATCHER:  Hello?  Hello?

LEE:  I just want to see my family again.  Let me go.

DISPATCHER:  Hello?

MALE VOICE:  (Inaudible) the f**king phone.

LEE:  Please let me go.  Please let me go.  Please let me see my family again.

MALE VOICE:  No f**king problem.

LEE:  Okay.

DISPATCHER:  Hello?

(Inaudible).

LEE:  I'm sorry.

[MALE VOICE:  I was gonna let you go and then you go f**k around.]

LEE:  [I'm sorry.  Please] let me go.

MALE VOICE:  Where's my phone?

DISPATCHER:  Hello?

[MALE VOICE:  Now I've got to go to the next street because of him.]

LEE:  I'm sorry.  Please let me go.

MALE VOICE:  What are you doing?

(Inaudible).

- 4 -

LEE:  Please let me go, please.  Oh, God, please.

[MALE VOICE:  (inaudible) in front of my cousin Harold.]

DISPATCHER:  Hello?

LEE:  Please let me go, [God] please.

MALE VOICE:  I told you I would.

DISPATCHER:  Hello?

LEE:  Help me.

DISPATCHER:  What's the address?

LEE:  Please help me.

DISPATCHER:  What's the address that you're at?  [(to supervisor): Coming off the North Port Tower.]

LEE:  Please.

MALE VOICE:  I'm not (inaudible).

DISPATCHER:  Hello?

LEE:  Please let me go.

DISPATCHER:  What is the address that you're at?  Hello, ma'am?

LEE:  Where are we going?

MALE VOICE:  I've got to go up and around now because of what you did.

LEE:  Up and around where?

MALE VOICE:  Didn't you see (inaudible).  Exactly four streets— well, five streets over from your house.

LEE:  I couldn't tell (inaudible).

DISPATCHER:  What's your name, ma'am? Hello?  What's your name?

LEE:  Please.  My name is Denise.  I'm married to a beautiful husband, and I just want to see my kids again.

DISPATCHER:  Your name's Denise?

LEE:  I'm sorry.

DISPATCHER (to supervisor):  I'm thinking too, that he doesn't know.

LEE:  Please, God.  Please protect me.

DISPATCHER:  Are you on I-75?

LEE:  Where are we?

[MALE VOICE:  What did you do with my cell phone?]

LEE:  I don't know.  Please.  Protect me, please.

DISPATCHER:  Where are you at?  Can you tell if you're on I-75?

LEE:  I don't know where your phone is.  I'm sorry.

[MALE VOICE:  You be honest with me.]

LEE:  Can't you just tell me where we are?

DISPATCHER:  Are you blindfolded? If you are, press the button.

LEE:  I don't have your phone.  Please, God.

(Inaudible).

LEE:  I don't have it.  I'm sorry.

DISPATCHER:  Denise?  Do you know this guy?

[MALE VOICE:  Be honest.]

LEE:  I don't—I don't have it.  I'm sorry.

DISPATCHER:  Denise, do you know this guy?  (to supervisor: She might have the phone laid down and not hear a thing I'm saying too.  He keeps saying a phone.)

LEE:  I don't know where it is.  Maybe if I could see I could help you find it.

(Inaudible).

[LEE:  No, sir.]

DISPATCHER:  Denise?

LEE:  I'm looking for it.  Uh-huh?

DISPATCHER:  How long have you been gone from your house?

LEE:  I don't know.

DISPATCHER:  How long?

LEE:  I don't know.

DISPATCHER:  Do you know how long you've been gone from your house?

(Inaudible).

DISPATCHER:  What's your last name?

LEE:  Lee.

DISPATCHER:  Lee?

LEE:  Yeah.

DISPATCHER:  Do you know–

LEE:  I don't know where your phone is.

DISPATCHER:  Your name is Denise Lee?

LEE:  Uh-huh.

DISPATCHER:  Can you tell at all what street you're on?

LEE:  No.

DISPATCHER:  Do you know this guy that's with you?

LEE: No.

DISPATCHER: You don't know him from anywhere?

LEE: No. Please. Oh, God, help me.

DISPATCHER: What's your address? What's your home address; do you know?

(Inaudible).

LEE: I don't know. Please just take me to my house. Can you take me home, on Latour, please?

DISPATCHER: Can you see or do you have a blindfold on?

LEE: I can't see. Where are we?

(Inaudible).

DISPATCHER: Can they turn off the radio or turn it down?

LEE: I can't hear you. It's too loud. Where are we?

(Inaudible).

LEE: Are you going to hurt me?

MALE VOICE: Give me the phone.

LEE: Are you going to let me out now?

MALE VOICE: As soon as I get the phone.

LEE: Help me.

At that moment, the call was terminated. The cellular telephone number from which the 911 call was dialed was identified as belonging to Michael King. Law enforcement proceeded to King's residence in North Port and forcibly entered the premises; however, neither Lee nor King was there.

During the early evening of January 17, while Shawn Johnson was stopped at a traffic light, he heard an adult female voice screaming for help. At the North Port police station, Johnson

subsequently selected Michael King from a photo lineup as the man who was operating the green Camaro from which the screams for help were emanating. Johnson also identified King as the driver during trial.

On that same day, at approximately 6:30 p.m., Jane Kowalski was stopped at a traffic light on Highway 41 when she heard someone screaming and a "commotion" coming from the Camaro that was in the traffic lane beside her. Kowalski made eye contact with the male driver of the Camaro. She subsequently identified King from a photo lineup and also during trial as the man who was driving the car. Kowalski described the screaming as, "Horrific, terrified. I've never ever heard anything like that in my life." As she watched, the man driving the Camaro turned around and began to push something down in the backseat. After the driver finished the downward motion, Kowalski saw a hand rise up from the back seat and begin banging loudly on the passenger-side window. When the traffic light turned green, Kowalski hesitated with the intent to be in a position to read the license plate of the Camaro as it passed. However, King refused to drive forward and, when Kowalski began to slowly roll forward, he changed traffic lanes and pulled behind her. When Kowalski realized that King would not pass her, she dialed 911 and described her observations of the Camaro and the behavior of the driver. While speaking with the dispatcher, Kowalski observed the Camaro make another lane change and then make a left turn onto Toledo Blade Boulevard, heading toward Interstate 75. Due to the traffic, she was unable to change lanes and follow the Camaro.

At 9 p.m. that evening, Deputy Christian Wymer and State Trooper Edward Pope were posted at Toledo Blade Boulevard near Interstate 75 watching for a green Camaro. From a series of "be on the lookout" (BOLO) announcements, the officers had a description of the car, a license plate number, and driver's license photos of Lee and King. At approximately 9:10 p.m., a green Camaro matching the description given in the BOLO drove from Toledo Blade Boulevard onto the on-ramp for I-75 southbound. Trooper Pope followed the Camaro and eventually caused it to stop. Based upon the information he had at that time, Pope conducted a felony stop, i.e., he placed his vehicle in a tactical position and drew his weapon. He ordered the driver to exit the vehicle multiple times, but the driver did not comply. Only after a fifth command, during which Pope advised that if the driver did not comply, he (Pope) would fire into the vehicle, the door

opened and the driver exited from the front door backwards, leaning over the console toward the passenger seat. Pope identified the driver as a "perfect match" to the person on Michael King's driver's license.

During the stop, Pope observed that King was wet from the waist down and had mud resin on the base of his shoes. King was wearing jeans and a shirt with a camouflage pattern. [n.2]. In King's pockets, Pope discovered a wallet that contained King's driver's license with a photo that matched the picture that Pope had previously received. Pope also recovered a cellular phone, from which the battery and the SIM card had been removed. On the bra of the Camaro, Pope observed hair strands, and he also observed hair strands on the spoiler with what appeared to be blood pellets. A viscous, sap-like substance was present on the bra of the car. Inside the vehicle, Pope observed a gas can on the passenger seat and a cellular phone battery on the passenger-side floorboard. Pope observed a blanket and a ring in the backseat; however, Lee was not in the car. During trial, the parties stipulated that the ring found in the backseat of the Camaro belonged to Denise Lee.

> [n.2] Harold Muxlow testified that King was wearing a white shirt with a design when he arrived to borrow the shovel, gas can, and flashlight. Accordingly, King changed his shirt sometime between the time he left Muxlow's residence and when the police detained him on I-75.

After the car was towed to the North Port Police Department, a shovel with dirt caked on the underside was discovered in the back seat. During trial, Harold Muxlow identified the shovel as the one he gave King on the afternoon of January 17. A palm print found on the outside of the driver's-side window of the Camaro was identified as belonging to Denise Lee. DNA testing on the hair recovered from the outside of the Camaro matched the known profile of Lee to the exclusion of 110 trillion other Caucasians. Hair found in the backseat of the Camaro matched Lee's DNA to the exclusion of 9 trillion other individuals. The blanket located in the backseat tested positive for blood and matched Lee's DNA to the exclusion of 9 trillion other individuals. Blood found on the outside of the Camaro matched the DNA profile of Denise Lee . . . . Similarly, the sap-like substance

found on the bra of the Camaro matched the known DNA profile of Denise Lee . . . .

After a search warrant was obtained, a thorough search of King's home was conducted. . . . Upon entering the master bedroom, the technician noted that a yellow blanket covered the window. A Winnie the Pooh blanket, pillows, and a wad of duct tape with hair attached were on the floor. . . .

In the kitchen, the technician observed an intact roll of duct tape on the bar. A garbage bag in the pantry contained more duct tape with hair attached. The hairs that were attached to the duct tape in the garbage bag matched the known DNA profile of Denise Lee to the exclusion of 110 trillion other Caucasians. Swabs taken from the ends of the wadded duct tape located in the master bedroom matched the known DNA profile of Michael King to the exclusion of one quadrillion other Caucasians. The Winnie the Pooh blanket found in the master bedroom tested positive for blood and semen. The semen on the blanket matched the known DNA profile of King to the exclusion of 1.1 quadrillion other individuals, and Lee could not be excluded as the contributor of the blood.

On January 18, during the subsequent effort to locate Denise Lee, an individual involved in the search noticed an area of land near Plantation Boulevard in North Port where the earth appeared to be disturbed. In the vicinity of the disturbed area were two small piles of sand that were out of place for the normal terrain. In those two piles of sand were what appeared to be blood. According to a crime scene technician, it appeared that the blood had been on the ground previously and the sand had been placed on top of the blood because the sand had absorbed the blood. A forensics team commenced the excavation of the disturbed area on the morning of January 19. As the team removed the earth, they noticed scallop marks, which were consistent with a round-nose shovel digging straight down into the earth. At a depth of three feet one inch, the team discovered the nude body of Denise Lee, lying on her side in a fetal position. A gunshot wound was visible on the body, and there was water in the bottom of the hole.

A couple of days after the body of Lee was recovered, a single nine-millimeter shell casing was discovered in the grass near the gravesite, but a projectile was never found. A couple of hundred yards away from the gravesite, a crime scene technician recovered a pair of boxer shorts owned by Nathan Lee—but often worn by Denise

Lee—and a shirt belonging to Denise Lee.  The boxer shorts tested positive for sperm cells, and those cells matched the DNA profile of King to the exclusion of 3.5 trillion other individuals.

. . . .

The medical examiner testified that Denise Lee died from a single gunshot wound to the head.  The size of the wound indicated that the bullet could not have been larger than one centimeter, and that the projectile that caused the injury could have been from either a nine-millimeter or a thirty-eight caliber weapon.  Further, the wound was consistent with the gun having been placed against Lee's head at the time it was fired.  The location of the entrance wound, to the right of Lee's right eyebrow, led the medical examiner to conclude that the gun would have been in Lee's field of vision if her eyes were open.  The medical examiner further explained that when the gun was discharged, Lee's eye exploded, and he opined that the sap-like substance located on the bra of the Camaro could have been Lee's ocular fluid.  According to the medical examiner, there was aspirated blood in Lee's lungs, which indicates that Lee continued to breathe for a period of time after the wound was inflicted.

With regard to the rest of Lee's body, two pieces of duct tape were removed from her hair during the autopsy.  The medical examiner found bruises on Lee's wrists and, due to their same general location on each wrist, concluded that they could have been caused by ligatures and were consistent with defensive injuries.  The medical examiner noted that Lee had vaginal bruising and anal tearing, both of which were caused by insertion trauma.  The medical examiner concluded from the condition of the injuries that they were inflicted pre-mortem and were nonconsensual.  Semen recovered from Lee's vagina matched the DNA profile of King to the exclusion of 1 quadrillion other Caucasians.

The jury convicted King of first-degree murder, involuntary sexual battery, and kidnapping.

During the penalty phase, the State offered victim impact statements from Lee's father and Lee's husband.  King offered the testimony of Dr. Joseph Chong Sang Wu, who conducted a PET scan on King.  According to Wu, the PET scan demonstrated abnormal activity within his frontal lobe.  Wu concluded that this abnormal activity was consistent with a traumatic brain injury.  The PET scan also revealed an abnormal notch or divot in King's frontal lobe at the top of his head.  Wu testified that when King was six years old, he

suffered a head injury in a sledding accident, and his siblings reported that his behavior changed significantly after that accident. Wu testified that individuals who suffer frontal lobe injuries are more likely to have poor judgment, exhibit blunted affect, take excessive risks, have difficulty regulating impulses such as aggression, and have difficulty separating fantasy from reality. With regard to the latter, Wu was provided with statements from family members reporting that when King was seventeen, after watching the movie The Texas Chainsaw Massacre, he obtained a chainsaw and started chasing family members with it, while exhibiting no expression on his face. At the age of thirteen, while acting out a cartoon, King nearly killed his brother with a bow and arrow. After the sledding injury, King required special education services. According to Wu, King's most recent verbal IQ score placed him in the borderline retarded range.

King also suffered from headaches and buzzing in his head, both of which were exacerbated by stress. In December 2007, after breaking up with a girlfriend, facing bankruptcy along with the loss of his Florida home, and being unemployed for a prolonged period of time, King began to behave strangely, as if dazed. At times he appeared to be in a catatonic state. Family members testified that he became paranoid during that time. Further, a second girlfriend stated that on January 15, 2008 (two days before the abduction), King's behavior was becoming more extreme in that he believed the neighbors were looking in the windows. [n.3]. Wu concluded that, due to the frontal lobe injury, King demonstrates a significant impairment in his ability to conform his behavior to the requirements of law. On cross-examination, however, Wu admitted that he had not been provided with information about King's affect or behavior on January 17 or 18.

> [n.3] However, at the same time, this witness testified that she spoke with King on the morning of January 17th, and between the hours of 4 and 6 p.m. that day (i.e., after he abducted Denise Lee), and he sounded completely normal.

King's siblings, his father, and his sister-in-law testified further as to King's sledding accident and his strange, risk-taking behavior. Furthermore, the family and King's girlfriends testified that they never saw King abuse drugs or alcohol. Testimony was presented that

King was a successful plumber, he tried to lead an honest life, and he never became violent with women . . . .

    . . . .

Dr. Kenneth Vesser performed an IQ test on King, which produced a verbal IQ score of 71, a performance IQ score of 85, and a full scale IQ of 76. This placed King in the borderline intellectual functioning range. However, on cross-examination, Visser opined that the ability of King to concentrate was actually stronger than the IQ score indicated. Visser stated that King was strong in important areas such as comprehension of why laws are necessary and why certain rules are in place. King was also strong in his ability to look at a situation, understand its natural progression, and predict the consequences. Visser testified that he did not perform validity testing to detect whether King was malingering. . . .

The State presented Dr. Michael Gamache, who testified that he conducted psychometric tests on King to evaluate his cognitive skills. A validity test administered to King indicated that he was not applying full effort and, therefore, Gamache concluded that the test results were not reliable as an indication of King's actual abilities. Gamache also administered an IQ test to King, which produced a full scale IQ of 76. However, Gamache testified that IQ scores tend to remain stable throughout one's lifetime, and when King took IQ tests in 1979 and 1984—both after the sledding accident—he received full IQ scores of 85 and 82, respectively. Gamache opined that King's true IQ score is likely in the low average range, or somewhere in the 80s.

Gamache disagreed with Wu that some of King's symptoms reported by his girlfriends and family were consistent with frontal lobe damage. . . . Based on his evaluation of King and the records he reviewed—which included correspondence between King and family members, employment records, interviews and deposition transcripts, and competency evaluations—Gamache concluded that King's ability to conform his conduct to the requirements of law is not substantially impaired.

Id. at 212-21 (footnote omitted).  The jury unanimously recommended a sentence of death.  Id. at 221.  Following the jury recommendation, a Spencer[1] hearing commenced, in which King presented additional evidence related to his bankruptcy, divorce, school history, jail records, and work history.  Id.

After the Spencer hearing, the trial court sentenced King to death.  Id.  The court found that the State had proven four aggravating circumstances beyond a reasonable doubt: (1) the murder was especially heinous, atrocious, and cruel (HAC), section 921.141(5)(h), Florida Statutes (2007) (great weight); (2) the murder was cold, calculated, and premeditated (CCP), section 921.141(5)(i) (great weight); (3) the murder was committed for the purpose of avoiding arrest, section 921.141(5)(e) (great weight); and (4) the murder was committed during the course of a sexual battery or kidnapping, section 921.141(5)(d) (moderate weight).  King, 89 So. 3d at 221.  In finding the HAC aggravating circumstance, the trial court noted:

> It is most extraordinary and extremely rare that one can actually hear the emotions in the voice of an innocent victim, who is doomed to be murdered. . . .  The 911 recording of the victim tragically reveals her fear, mental state, her terror and her emotional strain.  One need only listen to portions of this call to comprehend her mental state. . . .
>     . . . .
>     The court acknowledges that although it quotes from the 911 call, it cannot, by any means, convey the fear and terror clearly heard in Denise Lee's voice in that recording.

---

1.  Spencer v. State, 615 So. 2d 688 (Fla. 1993).

Id. at 221 n.6 (brackets omitted).

The trial court also found the existence of two statutory mitigating circumstances: (1) King's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired, section 921.141(6)(f) (moderate weight); and (2) his age (thirty-six), section 921.141(6)(g) (little weight). King, 89 So. 3d at 221. This Court noted, without further comment: "It is both unclear and questionable why the trial court found age to be a mitigating factor." Id. at 221 n.8. The trial court further found that King had established thirteen nonstatutory mitigating circumstances: (1) his head injury (moderate weight); (2) a PET scan that showed a brain injury (moderate weight); (3) a borderline IQ (moderate weight); (4) the fact that he repeated grades in school and was placed in special education classes (little weight); (5) he was despondent and depressed following bankruptcy, unemployment, a failed marriage, a foreclosure, and a failed relationship (little weight); (6) he did not have a history of violent behavior (moderate weight); (7) he was cooperative during his period of incarceration (some weight); (8) he has never abused drugs or alcohol (some weight); (9) he helped raise and care for his thirteen-year-old son (little weight); (10) he was a good father (little weight); (11) he was a devoted boyfriend (little weight); (12) he was a good worker (little weight); and (13) he had a close relationship with his family and friends (little weight). Id. at 221-22. After

concluding that the aggravation substantially outweighed the mitigation, the court sentenced King to death. Id. at 222.

Following his sentence, King raised several claims of error before this Court: (1) the trial court abused its discretion when it struck portions of the cross-examination testimony of a witness for the State; (2) the prosecution impermissibly shifted the burden of proof to King during guilt-phase closing statements; (3) the trial court abused its discretion to admit shell casings obtained from a gun range that King had visited earlier on the day he abducted, raped, and killed Lee; (4) the trial court improperly declined to conduct a Frye[2] hearing to determine the admissibility of tool-mark identification evidence of fired shell casings; (5) the State offered an unacceptable explanation for utilizing a peremptory strike to remove Juror 111, who was a minority; and (6) his sentence was disproportionate. King, 89 So. 3d at 222-31. This Court rejected each of King's asserted errors and affirmed his convictions and sentences. Id. The United States Supreme Court denied certiorari review on October 15, 2012. King v. Florida, 133 S. Ct. 478 (2012).

---

2. Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

- 17 -

## Postconviction Proceedings

On September 4, 2013, King filed a motion to vacate judgement and sentence pursuant to Florida Rule of Criminal Procedure 3.851. He raised the following claims in that motion: (1) trial counsel rendered ineffective assistance of counsel by failing to investigate King's exposure to toxic substances; (2) trial counsel rendered ineffective assistance of counsel by failing to preserve a Batson[3] challenge to the State's peremptory strike of Juror 111; (3) Florida's lethal injection protocol is unconstitutional; (4) Section 945.10, Florida Statutes (2013), is unconstitutional; (5) King may be incompetent at the time of his execution; and (6) cumulative error during trial deprived King of his right to a fair trial. King requested an evidentiary hearing only on Claims 1 and 2. Following a Huff[4] hearing, the postconviction court granted an evidentiary hearing on those two claims, which was held on June 23, 2014.

During the evidentiary hearing, King presented testimony from Lori Wagoner, Dr. Andres Lugo, and the three attorneys who represented King during his initial trial, Jerome Meisner, John Scotese, and Carolyn Schlemmer. The State presented testimony from Karen McClellan, an investigator with the Office of the

---

3. Batson v. Kentucky, 476 U.S. 79 (1986).

4. Huff v. State, 622 So. 2d 982 (Fla. 1993).

Public Defender who served as the mitigation specialist during King's trial. Wagoner offered testimony regarding the chemicals that she and King used as employees at Babe's Plumbing. Some of these chemicals caused headaches and lightheadedness, particularly when used in poorly ventilated areas or under hot temperatures. Dr. Lugo testified with respect to King's exposure to toxic substances during his childhood and when he worked as a plumber as an adult. Schlemmer, Scotese, and Meisner testified with respect to their decisions during King's trial with respect to jury selection and the presentation of mitigating evidence. McClellan offered testimony regarding her investigation into King's childhood.

On August 21, 2014, the postconviction court denied claims 1, 2, 3, 4, and 6, and denied without prejudice claim 5, that King may be incompetent by the time of his execution. King appealed the denial of claims 1 through 5 to this Court. On January 12, 2016, the United States Supreme Court issued its decision in Hurst v. Florida, which held that the capital sentencing scheme in Florida violated the Sixth Amendment under Ring v. Arizona, 536 U.S. 584 (2002). Hurst v. Florida, 136 S. Ct. at 621. This Court sua sponte ordered the parties to file supplemental briefs discussing the effect, if any, of Hurst v. Florida on the present matter. This review follows.

## ANALYSIS

### Toxic Substances

King first claims that trial counsel rendered ineffective assistance during the penalty phase because counsel failed to investigate King's possible exposure to toxic substances during his childhood and when he worked as a plumber as an adult. This Court has established the procedures for reviewing a claim of ineffective assistance of counsel:

> To prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Strickland v. Washington, 466 U.S. 668, 687 (1984). As to the first prong, the defendant must establish that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.; see also Cherry v. State, 659 So. 2d 1069, 1072 (Fla. 1995). For the second prong, "Strickland places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different." Wong v. Belmontes, 558 U.S. 15 (2009) (quoting Strickland, 466 U.S. at 694). Strickland does not "require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " Porter v. McCollum, 558 U.S. 30 (2009) (quoting Strickland, 466 U.S. at 693-94). This Court employs a mixed standard of review, deferring to the postconviction court's factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo. See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

Rodgers v. State, 113 So. 3d 761, 767 (Fla. 2013). Moreover, the failure to satisfy one prong of Strickland will defeat a claim of ineffective assistance of counsel.

See, e.g., Zommer v. State, 160 So. 3d 368, 377 (Fla. 2015) ("[B]ecause Strickland requires that a defendant establish both deficiency and prejudice, an appellate court evaluating a claim of ineffectiveness is not required to issue a specific ruling on one component of the test when it is evident that the other component is not satisfied." (citing Mungin v. State, 932 So. 2d 986, 996 (Fla. 2006))).

During the evidentiary hearing, King presented testimony from Wagoner, King's coworker, and Dr. Lugo, a medical toxicologist who is also licensed to practice medicine in Mexico. Dr. Lugo reviewed King's medical, employment, and school records, as well as the competency evaluations performed prior to King's initial trial. Dr. Lugo also interviewed King, members of his family, a girlfriend of King's, and Wagoner to determine what toxic substances King may have been exposed to as a child and during his career as a plumber. Dr. Lugo testified that King was chronically exposed to environmental toxins throughout his childhood in suburban and rural Michigan. Many chemicals that are now understood to cause developmental problems and low IQ in children were commonly and liberally applied to farms and golf courses, which King lived near throughout his childhood. Dr. Lugo testified that such chemical exposure in King's childhood could have had an additive effect on a head injury that King suffered during a sledding accident, which may have exacerbated King's neurological symptoms.

- 21 -

However, during cross-examination, Dr. Lugo admitted that he was not qualified to diagnose brain damage, and he did not perform any tests on King. Additionally, Dr. Lugo testified that he initially believed that King spent his entire childhood on a farm, but subsequently learned that King lived at several different locations, one of which was five to ten miles away from the nearest farm. Dr. Lugo also admitted that he knew of no studies that established higher rates of brain damage or other health problems among children who were raised in the same areas as King.

Wagoner detailed the chemicals that she and King used as plumbers, some of which induced headaches and lightheadedness. Dr. Lugo also testified that King was both chronically and acutely exposed to toxic chemicals as a plumber. These chemicals can cause drowsiness, impaired thinking, impaired reflexes, loss of consciousness, and loss of memory. Dr. Lugo believed that King suffered side effects from exposure to these chemicals based on reports that King told his girlfriend that he occasionally became lost and was in a catatonic state. However, Wagoner also testified that these chemicals are commonly used in the plumbing industry; any side effects that she suffered appeared to be temporary; and when she worked with King, he tended to act in a supervisory capacity.

Schlemmer, who primarily oversaw the penalty phase of King's trial, testified that she extensively explored several potential avenues of mental health

mitigation before ultimately presenting Dr. Wu. She initially retained Dr. Ross and Dr. Sesta, who did not believe King's report of having passed out from exposure to rat poison. Dr. Sesta and Dr. Ross believed that King was malingering and was a pathological liar; accordingly, Schlemmer believed that their testimony would damage the credibility of the defense. Schlemmer retained four additional experts—Dr. Kasper, Dr. DeClue, Dr. Regnier, and Dr. Gamache—none of whom were able to provide information that would have aided King's defense. Schlemmer also retained Dr. Visser, who only considered King's competency and testified during King's trial regarding King's low IQ. See King, 89 So. 3d at 220. Schlemmer purposely limited Dr. Visser's examination of King to his competency alone because she was concerned that if Dr. Visser also conducted a neuropsychological evaluation on King, Dr. Visser would reach similar conclusions as Dr. Sesta and Dr. Ross—that King was malingering and a pathological liar.

As she was "grasping at straws," Schlemmer retained Dr. Wu, who conducted a PET scan of King and found brain abnormalities. Schlemmer testified that the PET scan needed to be correlated to some injury or other clinical diagnosis. The only evidence available to the defense was the sledding accident that King suffered as a child. His family members all attributed his neurological symptoms and behavioral changes to the sledding accident, and King's medical

records from that accident had been destroyed. Schlemmer testified that the only toxic substance exposure that King reported was rat poison and crack pipe fumes, which was reported to, but not believed by, Dr. Sesta. Neither King nor his family members ever reported concerns about environmental toxins. Additionally, Schlemmer testified that she could not present testimony from King's mother, whom Schlemmer suspected would commit perjury about the sledding accident if she testified.

Schlemmer also offered an explanation as to why she did not have Dr. Wu investigate King's potential exposure to toxic plumbing chemicals. Interviews with King's former employers revealed damaging information about King that could potentially be used by the State in rebuttal, including that King: had been fired for lying; had made inappropriate comments to women; had exposed himself to a woman who was breastfeeding a child; and had stolen jobs by underbidding his employer. Accordingly, Schlemmer limited Dr. Wu's investigation and testimony to the sledding accident.

Additionally, the State presented testimony from Karen McClellan, the mitigation specialist during King's trial. She reported that she traveled to Michigan, where she visited some of the addresses listed by King, and spoke to members of his family. One of these addresses was a suburb of Pontiac, Michigan. Additionally, neither King nor his family members informed her of previous farm

work, nor did they report complaints about chemical exposure. However, she admitted that she did not speak to anyone involved with King's case regarding potential toxic substance exposure, nor did she confer with Schlemmer regarding the possibility of retaining an expert toxicologist.

The postconviction court found that King had not established deficiency or prejudice as required by Strickland. We agree.

Quite simply, this case is not one in which counsel acted deficiently through a failure to investigate King's mental health or reliance upon previous social history reports. Cf. Porter, 558 U.S. at 39-40 (finding counsel to be deficient for failure to investigate the defendant's mental health, family background, or history of military service); Wiggins v. Smith, 539 U.S. 510, 524-26 (2003) (concluding that counsel's reliance only on reports from a presentencing investigation report and the Baltimore City Department of Social Services for mitigation constituted deficiency). Rather, Schlemmer conferred with eight different neuropsychology or mental health experts, nearly all of whom concluded that King was malingering and a pathological liar, or were otherwise unable to provide helpful testimony. See Hodges v. State, 885 So. 2d 338, 348-50 (Fla. 2004) (finding that counsel was not deficient for choosing not to present mental health mitigation after receiving unfavorable reports from two experts). Through her persistence, Schlemmer was able to present some mitigating mental health evidence via the testimony of Dr.

- 25 -

Wu, which was corroborated by testimony from King's family members that his behavior changed after the sledding accident. Further, Schlemmer explained that the only indication that King may have been exposed to toxic substances were claims of exposure to rat poison and crack pipe fumes, which at least one expert did not believe. Schlemmer testified that she explored any potential avenues of mitigation based on information provided by King and his family—including hiring an independent medical examiner and interviewing helicopter pilots after King claimed that he and Lee had engaged in consensual sex and that she was killed after being shot from a helicopter—but there was simply no evidence to suggest that King's exposure to toxic substances would be anything more than pure speculation. Trial counsel did not render deficient performance regarding King's potential exposure to toxic substances.

Because we conclude that King has failed to establish deficiency, we need not consider whether these decisions of trial counsel resulted in prejudice. E.g., Zommer, 160 So. 3d at 377. Therefore, we deny this claim.

<u>Failure to Preserve a Batson Error</u>

King next asserts that trial counsel rendered ineffective assistance when they failed to preserve an alleged <u>Batson</u> error during jury selection. Specifically, King alleges that counsel failed to challenge the veracity of the State's proffered reason for excluding Juror 111, which was that her brother was facing a pending felony

drug charge. King asserts that this reason was not supported by the facts of the record, which indicated that Juror 111 had previously been convicted of a drug-related offense and was facing a charge of disorderly conduct at the time of jury selection. King also alleges that counsel failed to conduct a comparative juror analysis after initially raising the Batson objection, and failed to object to the State's gender-based discriminatory peremptory challenge of Juror 111.

As with his previous claim, King must demonstrate both that counsel rendered deficient performance by failing to preserve the Batson challenge to Juror 111, and that he suffered prejudice as a result. Strickland, 466 U.S. at 687. The Supreme Court held in Batson that peremptory challenges cannot be used to exclude members of racial minorities from a jury. 476 U.S. at 96-97. The procedure and principles governing Batson challenges are as follows:

> A party objecting to the other side's use of a peremptory challenge on racial grounds must: a) make a timely objection on that basis, b) show that the venireperson is a member of a distinct racial group, and c) request that the court ask the striking party its reason for the strike. If these initial requirements are met (step 1), the court must ask the proponent of the strike to explain the reason for the strike.
> At this point, the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If the explanation is facially race-neutral and the court believes that, given all the circumstances surrounding the strike, the explanation is not a pretext, the strike will be sustained (step 3). The court's focus in step 3 is not the reasonableness of the explanation but rather its genuineness. Throughout this process, the burden of persuasion never leaves the opponent of the strike to prove purposeful discrimination.
> Voir dire proceedings are extraordinarily rich in diversity and no rigid set of rules will work in every case. Accordingly, reviewing

courts should keep in mind two principles when enforcing the above guidelines. First, peremptories are presumed to be exercised in a nondiscriminatory manner. Second, the trial court's decision turns primarily on an assessment of credibility and will be affirmed on appeal unless clearly erroneous. The right to an impartial jury guaranteed by article I, section 16 is best safeguarded not by an arcane maze of reversible error traps, but by reason and common sense.

Melbourne v. State, 679 So. 2d 759, 764-65 (Fla. 1996) (footnotes omitted).

Similarly, the exclusion of jury members on the basis of gender is prohibited, and peremptory strikes based on suspected gender discrimination are subject to the same procedure. J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127 (1994); Welch v. State, 992 So. 2d 206, 211 (Fla. 2008).

During voir dire of King's trial, the following exchange occurred:

THE COURT: Up to Juror 111, including 111. What says the State?

[THE STATE]: The State will strike Juror 111.

THE COURT: Okay, we're up to 114, Juror 114 as the 12th juror. What says the Defense?

MS. SCHLEMMER: Your Honor, we just have an issue.

MR. SCOTESE: We have an objection. She is a minority and we'd ask for a race neutral—

THE COURT: For Juror [111]?

MR. SCOTESE: Yes.

THE COURT: All right, thank you. Juror 111—

[THE STATE]: Yes, Judge. On Juror 111—she's an 18-year-old female. She came across as meek, young and inexperienced. She's the youngest on the panel we have existing so far.

Her statement during the original qualification was that living life in prison is more awful than a death sentence. Her brother has a pending felony drug charge. She watches the television show CSI. Commonly, a concern of ours is that they would hold us to a TV standard as opposed to a regular standard.

And based on those foregoing reasons, we exercise our peremptory challenge on Number 111.

MR. SCOTESE: Your Honor, it is our position that those are not sufficient reasons. There's many people here on this jury that have similar—there is one person who is—

THE COURT: I understand on the panel you've got jurors who watch CSI or watch Perry Mason or whatever. That's not—

[THE STATE]: As a single thing, a genuine—my race neutral reason, this is not a challenge for cause, she indicated that living a life in prison is more awful than a death sentence.

THE COURT: Other jurors have said it. Other jurors have said the same thing.

[THE STATE]: And I will strike what other jurors are remaining on the panel that said that. I'm consistently getting rid of any—

THE COURT: Here's what I'm going to find. The fact that—was it her brother who has a pending—

[THE STATE]: Yes. According to her questionnaire, her brother has a pending drug charge.

THE COURT: Pending criminal charge? All right. I'm going to find based upon that that is a genuine race neutral reason and I'll grant the challenge, peremptorily. I'll find that the explanation is facially race neutral and the reason given is genuine; and given all the circumstances, the explanation is not a pretext and the strike will be sustained.

Ultimately, seven women were seated on King's jury, and the State did not exercise all of its peremptory strikes.

During the postconviction evidentiary hearing, evidence was presented that Scotese and Meisner primarily handled the guilt phase of King's trial. At the time of King's trial, Scotese had handled one capital case and was death-qualified; Meisner was not qualified to handle capital cases. Meisner took notes and conferred with co-counsel during jury selection, but testified that he no longer had any independent recollection of jury selection during King's trial. Scotese testified that he took notes and questioned some jurors during jury selection. According to Scotese, objections during jury selection were made with Schlemmer's approval.

Scotese testified that at the time of King's trial, he was familiar with Batson, and he usually noted when a potential juror was a minority to remind himself to raise potential Batson challenges. He also testified that it was his usual practice to request a race-neutral basis for a peremptory strike of a minority juror, and that it would be rare for him to fail to do so, unless a race-neutral basis for the peremptory strike was obvious to him. However, he was not familiar with case law that prohibits the use of peremptory strikes on the basis of gender, and he did not consider raising a gender-based objection to the State's exercise of a peremptory strike of Juror 111. Scotese also testified that he attempts to conduct comparative juror analyses to preserve Batson challenges, but admitted that he was

"not very good at it." He also did not recall consulting Juror 111's questionnaire regarding the matter of the pending charge against her brother, but testified that if he had found a discrepancy between her questionnaire and her answers during voir dire, he would have pressed the matter for clarification.

Schlemmer testified that she had no independent recollection of the Batson challenge to Juror 111. However, after reviewing Juror 111's questionnaire, she added that she would not have wanted Juror 111 to serve on King's jury because Juror 111 indicated that a friend's father was a police officer. Schlemmer was concerned that Juror 111 might have been biased in favor of the State in light of the fact that the victim's father in this case was also a police officer. Further, Juror 111 included other responses in her questionnaire that concerned Schlemmer, such as the fact that she regularly watched crime shows like CSI. Schlemmer also thought that due to her relatively young age, Juror 111 might empathize with the victim upon hearing Lee's frightened 911 call. Schlemmer also testified that once the State had provided several race-neutral reasons for striking Juror 111, she did not believe there was a strong reason to maintain the Batson challenge.

Additionally, both handwritten and typed notes created by defense counsel during voir dire were admitted during the evidentiary hearing. Several handwritten notes were added to the typed notes that detailed the impressions of the defense attorneys with respect to potential jurors. Notably, a large handwritten "NO" was

written next to the notes pertaining to Juror 111. None of the attorneys who testified during the evidentiary hearing were sure who had written the "NO."

The postconviction court found that King failed to establish deficiency or prejudice. It concluded that the Batson challenge was not valid in light of multiple race neutral reasons offered by the State regarding Juror 111. Moreover, King failed to show that a seated juror was actually biased, the standard used to evaluate prejudice when a defendant alleges during postconviction that trial counsel was ineffective for failure to raise or preserve a cause challenge.

We agree with the trial court's conclusion that King failed to show that trial counsel rendered ineffective assistance with respect to this matter. As an initial point, we note that we previously considered and rejected the merits of King's Batson challenge on direct appeal. King 89 So. 3d at 229-31. As we indicated then, the reason proffered by the State—that Juror 111's brother was facing a criminal charge—is a valid race-neutral reason to exercise a peremptory strike. Id. at 230 (citing Fotopolous v. State, 608 So. 2d 784, 788 (Fla. 1992); Bowden v. State, 588 So. 2d 225, 229 (Fla. 1991)); see also Rice v. Collins, 546 U.S. 333, 341 (2006) (concluding that it was reasonable for the trial court to accept as race-neutral reasons for striking a minority female juror the facts that she was nineteen years old, single, lacked ties to the community, and might be too tolerant of the crimes at issue); cf. Nowell v. State, 998 So. 2d 597, 604-05 (Fla. 2008) (holding

that the State's age-based justification for exercising a strike was pretextual in that case, but noting that a juror's age can be a relevant consideration when evaluating the genuineness of a proffered justification).  The reasons offered by the State during trial are similarly gender-neutral.  Then, as now, King's underlying Batson claim is meritless.

To the extent that King's present claim rests on allegations of deficiency for failure to preserve the Batson challenge by failing to correct the State or the trial court regarding the nature of the charges faced by Juror 111's brother, or by failing to conduct a comparative juror analysis, we conclude that trial counsel did not act deficiently.[5]  The evidence admitted during the postconviction hearing indicated that defense counsel did not want Juror 111 to serve for several reasons.  Further, they were concerned about the impartiality of Juror 111 for some of the same reasons as the State, such as the fact that Juror 111 admitted that she watched television shows like CSI and she was young.  Schlemmer testified that she was

_____

5. Arguably, Scotese's admitted unfamiliarity with J.E.B. and related law that prohibits the exercise of peremptory strikes on the basis of gender was objectively unreasonable.  It is beyond the norms of professional standards for defense attorneys to be unfamiliar with longstanding, important, and binding precedent pertaining to jury selection.  Nonetheless, Scotese's ignorance on this matter did not rise to the level of deficiency because Scotese did not represent King alone.  Schlemmer, who was qualified to represent capital clients, ultimately accepted responsibility for decisions during jury selection and believed that the challenge to Juror 111 was meritless.  Therefore, we do not conclude that King's attorneys did not "function[] as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.

concerned that Juror 111 mentioned that a friend's father was a police officer. In light of such information, Schlemmer did not believe that any merit remained to the Batson challenge. Schlemmer's abandonment of a meritless claim did not constitute deficiency. See, e.g., Troy v. State, 57 So. 3d 828, 842-43 (Fla. 2011) (refusing to consider counsel deficient for failure to raise meritless claims).

Although we do not need to consider whether prejudice resulted, having concluded that counsel did not act deficiently, we also reject King's claim that he can demonstrate prejudice pursuant to Davis v. Secretary for the Department of Corrections, 341 F.3d 1310 (11th Cir. 2003). In Davis, trial counsel raised a meritorious Batson challenge during voir dire, but failed to renew the objection before the jury was sworn in as required by Joiner v. State, 618 So. 2d 174, 175-76 (Fla. 1993). 341 F.3d at 1312. Although his subsequent claim that the failure to preserve the Batson challenge constituted ineffective assistance of counsel was rejected by the Third District Court of Appeal, the Eleventh Circuit Court of Appeals granted him relief pursuant to a federal writ of habeas corpus. Id. at 1312, 1317. The Eleventh Circuit considered the decision in Roe v. Flores-Ortega, 528 U.S. 470 (2000), which involved a notice of appeal that was untimely filed, to support the proposition that Strickland may on occasion require determination of how deficient performance affected the client's appeal, rather than the trial. Davis, 341 F.3d at 1314-15. Concluding that counsel's failure to preserve his Batson

challenge solely affected Davis's appeal, the Eleventh Circuit held that the correct prejudice inquiry under such circumstances was whether there was a reasonable likelihood of a more favorable outcome on appeal. Id. at 1315-16.

However, the decision in Davis has since been recognized by the Eleventh Circuit as a "razor thin exception." Purvis v. Crosby, 451 F.3d 734, 739-40 (11th Cir. 2006) ("Our reasoning and the result in Davis arguably were pushing things given what the Supreme Court said in Strickland about measuring the effect of counsel's errors at the guilt stage of a trial against the result of the trial instead of the appeal."). Further, the Eleventh Circuit has rarely applied the exception in Davis. See United States v. Williams, 731 F.3d 1222, 1236 n.10 (11th Cir. 2013); Brown v. United States, 533 F. App'x 881, 883 n.2 (11th Cir. 2013); Lockwood v. Hooks, 415 F. App'x 955, 957 (11th Cir. 2011); Carratelli v. Stepp, 382 F. App'x 829, 832-33 (11th Cir. 2010); Crawford v. Hooks, 244 F. App'x 300, 303-04 (11th Cir. 2007). Other federal appellate courts have flatly rejected Davis's interpretation of Flores-Ortega. Kennedy v. Kemna, 666 F.3d 472, 486 (8th Cir. 2012) (citing Taylor v. United States, 279 F. App'x 368, 369 (6th Cir. 2008)).

More importantly to King's claim, this Court has also explicitly rejected Davis. Carratelli v. State, 961 So. 2d 312 (Fla. 2007). First, the Court explained that the standard regarding prejudicial error on direct appeal differs from that in a postconviction claim asserting ineffective assistance. Id. at 317-18. A properly

preserved error permits the trial court to correct errors as they arise and is reviewed for manifest error on direct appeal. Id. at 318. A defendant who can show that a juror suspected of bias was improperly seated is entitled to relief on direct appeal; however, an unpreserved error on direct appeal regarding an improper juror is not considered reversible. Id. at 319-20 (citing Busby v. State, 894 So. 2d 88, 96-97 (Fla. 2004); Singer v. State, 109 So. 2d 7, 19 (Fla. 1959)).

By comparison, a defendant claiming in a postconviction motion that trial counsel was ineffective is governed by Strickland. Carratelli, 961 So. 2d at 320. This Court specifically rejected Davis's proposition that it may be proper to consider the effect of counsel's deficiency on the defendant's appeal, rather than during trial. Id. at 321. The Court explained that renewing an objection before a jury is sworn in is fundamentally a trial concern, not solely an appellate matter. Id. Further, the Court determined that Strickland's concerns with prejudice centered "on the fundamental fairness of the proceeding whose result is being challenged." Id. at 322 (quoting Strickland, 466 U.S. at 696). This Court also noted that Flores-Ortega did not create such a sweeping change to Strickland as suggested by Davis, but simply permitted reviewing courts to presume prejudice when a defendant is entirely denied a proceeding, such as can occur when counsel fails to file a timely notice of appeal. Carratelli, 961 So. 2d at 322-23.

Accordingly, when considering the failure to preserve a challenge to potential jurors in voir dire, the reviewing court should focus on the defendant's trial, not his appeal. Id. at 323. Under such circumstances, this Court held that a defendant must show that a biased juror served during the defendant's trial to satisfy Strickland's requirement of showing a reasonable probability of a more favorable result. Id. at 323-34.

King asserts that Carratelli is distinguishable because Carratelli involved cause challenges, not peremptory strikes. However, the Court accepted jurisdiction in Carratelli based on conflict with the decision in Austing v. State, 804 So. 2d 603 (Fla. 5th DCA 2002), which concerned peremptory strikes. Carratelli, 961 So. 2d at 317. In Austing, the Fifth District Court of Appeal had reached a similar conclusion as the Eleventh Circuit in Davis that the prejudice resulting from the failure to preserve a Batson challenge during trial should be evaluated by the effect on the defendant's appeal. 804 So. 2d at 604. Nonetheless, we rejected that rationale in Austing without considering any distinction between the nature of peremptory and cause strikes. Carratelli, 961 So. 2d at 317, 327.

Therefore, King's reliance on Davis is misplaced. Under Carratelli, King has not demonstrated prejudice because he offered no evidence to indicate that any of the jurors who were seated in his trial were actually biased. Rather, the evidence King presented on postconviction was simply that this Court would have

ruled differently on direct appeal if the Batson challenge had been fully preserved. This is insufficient to demonstrate prejudice in this context. Therefore, we reject this claim.

## Lethal Injection

King next claims that the lethal injection protocol employed by Florida is unconstitutional. To successfully establish a claim that a particular method of execution is unconstitutional, a defendant must allege

> that the method presents a risk that is " 'sure or very likely to cause serious illness and needless suffering' and give rise to 'sufficiently imminent dangers.' " [Baze v. Rees, 553 U.S. 35, 50 (2008)]. . . . To prevail on such a claim, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for the purposes of the Eighth Amendment.' " 553 U.S., at 50.

Glossip v. Gross, 135 S. Ct. 2726, 2737 (2015) (some citations omitted). Challengers must also allege the existence of a readily available alternative method of execution that significantly reduces the risk of pain. Correll v. State, 184 So. 3d 478, 489 (Fla.) (citing Glossip, 135 S. Ct. at 2737-38), cert. denied, 193 L. Ed. 2d 307 (2015). Both the United States Supreme Court and this Court have firmly rejected constitutional challenges to the use of midazolam as a sedative in lethal injection protocols. See Glossip, 135 S. Ct. at 2739-46; Correll, 184 So. 3d at 488; Banks v. State, 150 So. 3d 797, 800-01 (Fla. 2014); Chavez v. State, 132 So. 3d 826, 831 (Fla. 2014); Muhammad v. State, 132 So. 3d 176, 195 (Fla. 2013).

King's cursory allegation is insufficient to satisfy the heavy burden of a successful constitutional challenge to the use of midazolam under Glossip and Baze. His facial challenge to the use of midazolam presents no basis for this Court to reconsider its conclusions in Correll or those of the United States Supreme Court in Glossip. King has also failed to allege the existence of a readily available alternative method of execution. Therefore, we conclude this claim is meritless.

Identity of Executioners

King also asserts that section 945.10, Florida Statutes (2014), which exempts from disclosure the identity of those individuals who participate in the lethal injection procedure, is unconstitutional. This Court has rejected recent challenges to the statute's validity. See Correll, 184 So. 3d at 486 (citing McLean v. State, 147 So. 3d 504, 513 (Fla. 2014); Darling v. State, 45 So. 3d 444, 447-48 (Fla. 2010); Henyard v. State, 992 So. 2d 120, 130 (Fla. 2008)). Additionally, the Court presumes that those individuals charged with conducting an execution will perform their duties properly. Lightbourne v. McCollum, 969 So. 2d 326, 343 (Fla. 2007). Although King asserts that executions in Florida and elsewhere have gone awry, undermining the presumption in Lightbourne, several executions have been conducted in Florida with no reported problems. See Correll, 184 So. 3d at 486 ("[T]he recent executions of Johnny Kormondy, Chadwick Banks, Eddie Davis,

John Henry, and Robert Hendrix have been carried out with no subsequent allegations of difficulties.").[6] Thus, we reject this claim as well.

Potential Future Incompetency

The final matter raised in King's initial brief is that King may be incompetent by the time he is scheduled for execution. Individuals who lack the mental capacity to understand their pending execution and the reasons for it cannot be executed. Fla. R. Crim. P. 3.811; see Barnes v. State, 124 So. 3d 904, 918 (Fla. 2013). However, as King acknowledges, claims of future incompetence are not ripe until a death warrant has been issued for a given individual. Fla. R. Crim. P. 3.811(c); Barnes, 124 So. 3d at 918 ("We have repeatedly held that this claim may not be asserted until a death warrant has been issued."); Israel v. State, 985 So. 2d 510, 521-22 (Fla. 2008) ("Israel concedes that this claim is not ripe for review . . . . He contends that he is only raising this issue for preservation purposes. This Court has repeatedly found that no relief is warranted on similar claims."). No warrant has been signed in this case; therefore, this claim is not properly before us at this time.

---

6. The executions of Jerry Correll in October 2015 and Oscar Ray Bolin, Jr., in January 2016 were similarly completed with no allegations of improper conduct or incompetence.

During the pendency of King's postconviction appeal, the United States Supreme Court issued Hurst v. Florida, in which it held that Florida's capital sentencing scheme violated the Sixth Amendment. See 136 S. Ct. at 621. The Supreme Court concluded that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." Id. at 619. On remand from the Supreme Court, we held that "before a sentence of death may be considered by the trial court in Florida, the jury must find the existence of the aggravating factors proven beyond a reasonable doubt, that the aggravating factors are sufficient to impose death, and that the aggravating factors outweigh the mitigating circumstances." Hurst v. State (Hurst v. State), 202 So. 3d 40, 53 (Fla. 2016). We further held that a unanimous jury recommendation is required before a trial court may impose a sentence of death. See id. Finally, we determined that a Hurst error is capable of harmless error review. See id. at 66-67. Recently, in Mosley v. State, Nos. SC14-436 & SC14-2108, 2016 WL 7406506 (Fla. Dec. 22, 2016), we further held that our decision in Hurst v. State applies retroactively to those postconviction defendants whose sentences were final after the United States Supreme Court's 2002 decision in Ring v. Arizona, 536 U.S. 584 (2002). See Mosley, 2016 WL 7406506, at *18 ("We conclude that . . . Hurst [v. State] should be applied to . . . defendants whose

sentences became final after the United States Supreme Court issued its opinion in Ring.").

Accordingly, because King's sentence became final on October 15, 2012, when the United States Supreme Court denied King's petition for certiorari, King v. Florida, 133 S. Ct. 478, we must consider whether any Hurst error in King's penalty phase proceedings was harmless beyond a reasonable doubt. In Hurst v. State, we explained the standard by which harmless error should be evaluated:

> Where the error concerns sentencing, the error is harmless only if there is no reasonable possibility that the error contributed to the sentence. See, e.g., Zack v. State, 753 So. 2d 9, 20 (Fla. 2000). Although the harmless error test applies to both constitutional errors and errors not based on constitutional grounds, "the harmless error test is to be rigorously applied," [State v.]DiGuilio, 491 So. 2d [1129,] 1137 [(Fla. 1986)], and the State bears an extremely heavy burden in cases involving constitutional error. Therefore, in the context of a Hurst error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for imposition of the death penalty did not contribute to Hurst's death sentence in this case. We reiterate:
>
>> The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.
>
> DiGuilio, 491 So. 2d at 1139. "The question is whether there is a reasonable possibility that the error affected the [sentence]." Id.

Id. at 23-24 (alteration in original). Finally, in Davis v. State, 41 Fla. L. Weekly S528 (Fla. Nov. 10, 2016), we determined that a Hurst error was harmless beyond a reasonable doubt and reiterated that "[a]s applied to the right to a jury trial with regard to the facts necessary to impose the death penalty, it must be clear beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravating factors that outweighed the mitigating circumstances." Id. at S539.

When the jury recommended that King be sentenced to death, it did not make specific factual findings with regard to the existence of any aggravating circumstances, nor did it make any findings with regard to the relative weight of the aggravating and mitigating circumstances. Therefore, we conclude that his sentence was contrary to Hurst v. Florida.

However, as in Davis, we conclude that this is one of those rare cases in which the Hurst error was harmless beyond a reasonable doubt. We initially must emphasize the unanimous jury recommendation of death in this case. The jury reached this unanimous recommendation even though it was specifically instructed, "In these proceedings it is not necessary that the advisory sentence of the jury be unanimous." Thus, this unanimous recommendation begins a foundation for us to conclude beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the

mitigating factors.  The instructions that were given informed the jury that it

needed to determine whether the aggravation outweighed the mitigation <u>before</u> it

could recommend a sentence of death:

> If you find the aggravating circumstances do not justify the death penalty, your advisory sentence should be one of life imprisonment without possibility of parole.
> Should you find sufficient aggravating circumstances do exist to justify recommending the imposition of the death penalty, it will then be your duty to determine whether the aggravating circumstances outweigh the mitigating circumstances that you find exist.
> . . . .
> If one or more aggravating circumstances are established, you should consider all the evidence tending to establish one or more mitigating circumstances and give that evidence such weight as you feel it should receive in reaching your conclusion as to the sentence that should be imposed.
> . . . .
> If, after weighing the aggravating and mitigating circumstances, you determine that the aggravating circumstances found to exist sufficiently outweigh the mitigating factors; or, in the absence of mitigating factors, if you find that the aggravating factors alone are sufficient, you may exercise your option to recommend that a death sentence be imposed rather than a sentence of life in prison without the possibility of parole.  However, regardless of your findings with respect to aggravating and mitigating circumstances you are never required to recommend a sentence of death.

From these instructions, we can further conclude that the jury unanimously

made the requisite factual findings to support a death sentence before it returned

the unanimous recommendations.  Although the record indicates that the jury did

ask the trial court whether a juror could recommend death "<u>without</u> agreeing to <u>all</u>

<u>four</u> of the aggravating circumstances beyond a reasonable doubt," the jury

ultimately returned a <u>unanimous verdict</u> based on the conclusion of all twelve jurors that <u>sufficient</u> aggravating circumstances existed that outweighed the mitigating circumstances. Considering the effect on the fact-finder as the central focus of our <u>Hurst</u> harmless error analysis, we further note that when King first appealed his sentence to this Court, he did not challenge the finding of <u>any</u> aggravating circumstances found below.[7]

---

7. We also conclude that the finding that the murder was committed during the course of a sexual battery or kidnapping was not erroneous. The United States Supreme Court indicated in <u>Apprendi</u> and <u>Ring</u> that there was one narrow exception to the Sixth Amendment requirement that a jury must find any fact that increases the maximum sentence: the fact of a prior conviction, as established in <u>Almendarez-Torres</u>. <u>Ring</u>, 536 U.S. at 597 n.4; <u>Apprendi v. New Jersey</u>, 530 U.S.466, 489-90 (2000). Although the Supreme Court has since suggested that the continued validity of <u>Almendarez-Torres</u> may be in question, it has not directly revisited the exception created in that case. <u>See</u> <u>Alleyne v. United States</u>, 133 S. Ct. 2151, 2160 n.1 (2013) (recognizing the "narrow exception" created by <u>Almendarez-Torres</u>, but noting that it was not directly at issue in <u>Alleyne</u>); <u>Ring</u>, 536 U.S. at 597 n.4 (noting that <u>Almendarez-Torres</u> was not the subject of Ring's challenge); <u>Apprendi</u>, 530 U.S. at 489 ("[I]t is arguable that <u>Almendarez-Torres</u> was incorrectly decided . . . ."). On this matter, we find persuasive the reasoning of the Arizona Supreme Court, which concluded unless and until the United States Supreme Court expressly rules otherwise, <u>Almendarez-Torres</u> remains a valid, if narrow, exception to <u>Apprendi</u> and <u>Ring</u>. <u>See</u> <u>State v. Ring</u>, 65 P.3d 915, 938 (Ariz. 2003) ("We cannot ignore a Supreme Court decision interpreting federal law unless the Court expressly overrules or casts cognizable doubt on that decision."); <u>see also</u> <u>State v. Whitfield</u>, 107 S.W.3d 253, 262 & n.7 (Mo. 2003) (finding no error by judge finding the existence of prior convictions as aggravating circumstances). Therefore, the jury in this case was not required to find the existence of the aggravating circumstance that King committed the murder during the course of sexual battery because he had already been convicted of sexual battery at the time he was sentenced.

Finally, the egregious facts of this case and both the evidence and how it was presented further resolve any doubt that a rational jury would have unanimously found that there were sufficient aggravating circumstances that outweighed the mitigating circumstances.  As we previously stated in King's direct appeal:

> King abducted a young mother from her home, leaving her two children—an infant and a toddler—unattended.  He transported her to his house where she was bound with duct tape, raped, and sodomized.  He then acquired a shovel, drove her to an abandoned construction [site], and shot her in the head.  Given the angle of the entrance wound, and the fact that a substance appearing to be ocular fluid was found on the car, it is logical to conclude that Lee was not blindfolded at the time of her shooting, and she saw the gun as it was placed against her head.  Furthermore, because Lee was abducted from her home between 1 and 2 p.m. on the 17th, and her 911 call was made at 6:14 p.m., it can be deduced that Lee was held captive by King for over four hours.  As noted in the sentencing order, rarely is a court able to experience what a deceased victim encountered.  In this case, anyone who listens to the 911 call placed by Denise Lee will hear the abject terror she was experiencing plus her panicked, frantic pleas to the 911 dispatcher (for help) and King (to be returned home).  This murder was unquestionably cold and cruel.

King, 89 So. 3d at 232.  Here the evidence captured and presented placed the jury in the terrible circumstances imposed by King.  Moreover, in the course of that 911 call, not only does the listener hear Denise Lee's fear, the listener also hears King state multiple times that he had intended to release Lee until she called out to King's cousin, Harold Muxlow, to call the police.  See id. at 213-14.  Multiple witnesses observed a woman screaming for help from a car driven by King, one of whom described the screaming as "[h]orrific" and "terrified."  Id. at 213-16.  Thus,

- 46 -

the evidence of the HAC, CCP, and avoid arrest aggravating circumstances—which King did not contest on direct appeal—was overwhelming and essentially uncontroverted.

Against these facts, in a light most favorable to King the jury was presented mitigating evidence that addressed that: (1) King suffered a childhood sledding accident, which affected his judgment, risk-taking, and behavior; (2) King displayed unusually aggressive behavior toward family members when he was a teenager; (3) King suffered from headaches and other neurologic symptoms as an adult; (4) as an adult, King tried to live a stable, successful life, although he struggled with foreclosure; (5) King did not receive any disciplinary reports while he was incarcerated; and (6) King was placed in special education classes as a child. Id. at 219-20. Additionally, the jury considered King's intellectual functioning. Id. at 220. Ultimately, however, as emphasized above, the jury unanimously recommended a sentence of death. Id. at 221.[8]

Although the Supreme Court in Hurst v. Florida cautioned against substituting the jury recommendation for the factual findings required by the Sixth

---

8. Additionally, although such evidence was not presented to the jury, this Court cannot overlook the evidence presented in the postconviction evidentiary hearing that multiple mental health experts concluded that King was malingering and a pathological liar.

Amendment,[9] we conclude that this is one of the rare cases in which a <u>Hurst</u> error is harmless beyond a reasonable doubt. We reach this conclusion in light of the unanimous jury recommendation, King's failure to challenge evidence presented in aggravation, as well as the overwhelming and uncontroverted evidence of the four aggravating circumstances and the comparatively weaker mitigating evidence that was challenged by the State. If any case were to present us with a harmless <u>Hurst</u> error, this is it.

## CONCLUSION

We conclude that King has failed to demonstrate that counsel rendered ineffective assistance of counsel with respect to both his potential exposure to toxic substances and the <u>Batson</u> challenge. We also find his legal challenges to Florida's execution procedures to be meritless and determine that his claim regarding his potential future incompetency is not ripe. Finally, we hold that any <u>Hurst</u> error that occurred during his sentencing is harmless beyond a reasonable doubt. Therefore, we affirm the order below.

It is so ordered.

LABARGA, C.J., and PARIENTE, and LEWIS, JJ., concur.
CANADY and POLSTON, JJ., concur in result.
PERRY, Senior Justice, concurs in part and dissents in part with an opinion, in which QUINCE, J., concurs.

---

9. <u>See</u> 136 S. Ct. at 622.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PERRY, Senior Justice, concurring in part and dissenting in part.

I agree with the majority's conclusion that King is not entitled to postconviction relief for most of his claims. However, because I cannot agree with the majority's conclusion that there is no reasonable possibility that the Hurst v. Florida, 136 S. Ct. 616 (2016), error that occurred in this case did not affect King's sentence, I respectfully dissent. In Hurst v. State (Hurst), 202 So. 3d 40, 69 (Fla. 2016), we declined to speculate why the jurors voted the way they did; yet, because the jury vote here was unanimous, the majority is comfortable substituting its weighing of the evidence to determine which aggravators each of the jurors found. Even though the jury unanimously recommended the death penalty, whether the jury unanimously found each aggravating factor remains unknown.

In Hurst, we held that for a defendant to be eligible for the death sentence, a jury must unanimously find the existence of each aggravating factor, that the aggravating factors are sufficient, and that the aggravating factors outweigh the mitigating circumstances. Hurst, 202 So. 3d at 44. Additionally, we held that the jury's death sentence recommendation must be unanimous. Id. While I agreed in Hurst that Hurst v. Florida errors are subject to harmless error review, see Hurst, 202 So. 3d at 67-69, I believe that the majority's conclusion that the error was harmless beyond a reasonable doubt in this case is mistaken.

- 49 -

In this case, the State presented and the trial judge found the existence of four aggravating circumstances: that the murder was heinous atrocious or cruel (HAC); that the murder was cold, calculated and premeditated (CCP); that the murder was committed to avoid arrest; and that King committed the murder during the course of a sexual battery or kidnapping. Of these aggravators, only one can be said to be clearly established by the evidence—a unanimous jury found that King was guilty of sexual battery and kidnapping. The remaining aggravators each required factual findings that under Hurst must now be considered and weighed by a jury. The majority concludes that the error is harmless because no reasonable jury would have failed to find, from the aggravating factors given, that the evidence of HAC, CCP, and avoid arrest "was overwhelming and essentially uncontroverted." Majority op. at 47. The majority's conclusion is belied by the question the jury posed to the trial judge during deliberations, asking whether a juror could recommend death "without agreeing to all four of the aggravating circumstances beyond a reasonable doubt." From this question, I infer that at least one juror did not find all four aggravating circumstances, and therefore, I cannot conclude that a unanimous jury made the necessary findings to impose the death sentence in this case. As we stated in Hurst, without an interrogatory verdict, we cannot determine which aggravators the jury unanimously found beyond a reasonable doubt. See Hurst, 202 So. 3d at 68.

The majority's reweighing of the evidence to support its conclusion is not an appropriate harmless error review. The harmless error review is not a sufficiency of the evidence test, and the majority's analysis should instead focus on the effect of the error on the trier of fact. State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986). By ignoring the record and concluding that all aggravators were unanimously found by the jury, the majority is engaging in the exact type of conduct that the United States Supreme Court cautioned against in Hurst v. Florida. See Hurst v. Florida, 136 S. Ct. at 622 ("The State cannot now treat the advisory recommendation by the jury as the necessary factual finding that Ring [v. Arizona, 536 U.S. 584 (2002),] requires").

Because the harmless error review is neither a sufficiency of the evidence review "nor a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence," see State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986), I conclude that the error here was harmful.

QUINCE, J., concurs.

An Appeal from the Circuit Court in and for Sarasota County,
        Deno G. Economou, Judge - Case No. 582008CF001087XXXANC

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel – Middle Region, and Maria Christine Perinetti, Raheela Ahmed, and Donna Ellen Venable, Assistant Capital Collateral Regional Counsel – Middle Region, Tampa, Florida,

        for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; Scott Andrew Browne, Senior Assistant Attorney General, and Carol Marie Dittmar, Senior Assistant Attorney General, Tampa, Florida,

for Appellee