# Supreme Court of Florida

_____

No. SC17-793
_____

**MICHAEL GORDON REYNOLDS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[April 5, 2018]

PER CURIAM.

This case is before the Court on appeal by Michael Reynolds from an order denying a motion to vacate sentences of death under Florida Rule of Criminal Procedure 3.851. Because the order concerns postconviction relief from sentences of death, this Court has jurisdiction under article V, section 3(b)(1), of the Florida Constitution. For the reasons explained below, we affirm the circuit court's denial of relief.

## FACTUAL AND PROCEDURAL BACKGROUND

We detailed the underlying crimes in Reynolds's direct appeal. *Reynolds v. State* (*Reynolds I*), 934 So. 2d 1128, 1135-39 (Fla. 2006). For the purposes of this

proceeding, it is relevant that Reynolds was convicted for the first-degree murders of Robin and Christina Razor, along with the second-degree murder of Danny Privett and the burglary of a dwelling with armed battery. *Id.* at 1135.

At the penalty phase, Reynolds waived his right to present mitigating evidence. Outside the presence of the jury, Reynolds was advised of his right to present mitigation evidence, but he waived that right after conferring with counsel at length. Moreover, the trial court conducted a thorough colloquy to ensure that Reynolds understood the rights that he was waiving and even recessed for one day, giving Reynolds the opportunity to fully consider his decision. *Reynolds v. State* (*Reynolds II*), 99 So. 3d 459, 493-97 (Fla. 2012). Concerning his waiver, Reynolds explained his decision:

> *I don't want to present a mitigating case here because there's no such thing. I mean, Your Honor, it's a waste of time because I have* [*no mitigators*]. *I've been locked up all my life.*
>
> . . . .
>
> . . . *I have no mitigating*, I have nothing that's gonna dictate against my record, and I know that the final outcome of this is that I'm gonna go to death row, and I would wish, if you would, and if *y'all would honor that and please let me get this done and get up the road. And that's about the best way I can say it, Your Honor. I'm ready to go.*

*Id.* at 493-94 (alteration in original). Trial counsel swore in an affidavit that Reynolds waived mitigation, "at least in part, because he did not think there was

any chance of convincing six jurors to vote for life, and did not want to subject his sisters to the stress of testifying before a jury."

In a pretrial motion, Reynolds moved for the use of a special verdict form containing jury factfinding on aggravation. The trial court denied that motion. Moreover, in reading the instructions, the trial court informed the jury that "the final decision as to what punishment shall be imposed is the responsibility of the judge." Yet, the trial court explained that it could reject their advisory recommendation "only if the facts [were] so clear and convincing that virtually no reasonable person could differ." The trial court also informed the jury that "the law require[d] the court to give great weight" to the recommendation.

After deliberation, the jury unanimously recommended death on each count of first-degree murder.

At a *Spencer*[1] hearing, trial counsel filed mitigation with the trial court that it would have presented at the penalty phase—absent Reynolds's waiver of that right. The trial court conducted the *Spencer* hearing. As a result, the trial court found the following aggravators proven beyond a reasonable doubt and afforded great weight to each: for the murder of Robin Razor, the trial court found four aggravators—(1) Reynolds's previous conviction for another capital felony or felony involving use

---

1. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

or threat of violence to a person; (2) Reynolds committed the murder while engaged in, or the accomplice to, or attempting to commit, a burglary; (3) the murder was committed for the purpose of avoiding a lawful arrest; and (4) the murder was especially heinous, atrocious, or cruel (HAC)—and for the murder of Christina Razor, the trial court found the same four aggravators, along with a fifth aggravator—the victim of the murder was a person less than twelve years old. On each count of first-degree murder, the trial court found the existence of four statutory mitigators and afforded little weight to each: (1) Reynolds was gainfully employed; (2) Reynolds manifested appropriate courtroom behavior; (3) Reynolds cooperated with law enforcement; and (4) Reynolds had a difficult childhood, including various subparts.[2] In accordance with *Muhammad v. State*, 782 So. 2d 343 (Fla. 2001), the trial court did not afford great weight to the unanimous jury recommendation because the jury did not hear the mitigation.[3] After weighing the substantial aggravation against the minimal mitigation, the trial court sentenced Reynolds to death for the murders of Robin and Christina Razor.

---

2. The trial court rejected two statutory mitigators and afforded them no weight: (1) residual doubt; and (2) Reynolds's easy adjustment to prison life.

3. Any question regarding the continued vitality of *Muhammad* is not before us today.

Reynolds appealed his convictions and sentences to this Court, and we affirmed. *Reynolds I*, 934 So. 2d at 1161. His petition for writ of certiorari was denied by the United States Supreme Court on January 8, 2007. *Reynolds v. Florida*, 549 U.S. 1122 (2007). Pursuant to Florida Rule of Criminal Procedure 3.851, Reynolds filed his initial motion for postconviction relief, raising several claims. After an evidentiary hearing, the circuit court denied each claim, which we affirmed along with denying his petition for writ of habeas corpus. *Reynolds II*, 99 So. 3d at 501.

Following *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017), Reynolds filed the instant successive motion to vacate his sentences of death. After a case management conference on March 2, 2017, the circuit court denied Reynolds's successive motion in a subsequent written order.

This appeal follows.

## ANALYSIS

In this successive postconviction motion, Reynolds raises two claims: (1) his death sentences violate the Sixth Amendment in light of *Hurst* and *Hurst v. Florida*, 136 S. Ct. 616 (2016); and (2) his death sentences violate the Eighth Amendment under *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and must be vacated in light of *Hurst*, *Hurst v. Florida*, and *Perry v. State*, 210 So. 3d 630 (Fla.

- 5 -

2016). These issues present purely legal questions, which we review de novo. *E.g.*, *Mosley v. State*, 209 So. 3d 1248, 1262 (Fla. 2016).

**Sixth Amendment *Hurst* Claim**

Reynolds contends that the circuit court erred in denying his successive motion for postconviction relief pursuant to *Hurst* under the Sixth Amendment.

Reynolds's death sentences became final when the Supreme Court denied his writ of certiorari on January 8, 2007. *Reynolds v. Florida*, 549 U.S. 1122. Because the sentences became final after *Ring v. Arizona*, 536 U.S. 584 (2002), *Hurst* applies retroactively to this case. *E.g.*, *Mosley*, 209 So. 3d at 1274-83 (applying *Hurst* retroactively to a post-*Ring*, postconviction defendant). In *Hurst*, we held "that in addition to unanimously finding the *existence* of any aggravating factor, the jury must also unanimously find that the aggravating factors are *sufficient* for the imposition of death and unanimously find that the aggravating factors *outweigh* the mitigation before a sentence of death may be considered by the judge." 202 So. 3d at 54. Further, we concluded that *Hurst* error is capable of harmless error review. *Id.* at 66-68; *see, e.g.*, *King v. State*, 211 So. 3d 866, 889 (Fla. 2017). Accordingly, we must decide whether Reynolds's *Hurst* error was harmless beyond a reasonable doubt. *E.g.*, *Davis v. State*, 207 So. 3d 142, 174 (Fla. 2016).

In *Hurst*, we explained our standard for harmless error review:

Where the error concerns sentencing, the error is harmless only if there is no reasonable possibility that the error contributed to the sentence. Although the harmless error test applies to both constitutional errors and errors not based on constitutional grounds, "the harmless error test is to be rigorously applied," and the State bears an extremely heavy burden in cases involving constitutional error. Therefore, in the context of a *Hurst v. Florida* error, the burden is on the State, as the beneficiary of the error, to prove beyond a reasonable doubt that the jury's failure to unanimously find all the facts necessary for the imposition of the death penalty did not contribute to Hurst's death sentence in this case. We reiterate:

> The test is not a sufficiency-of-the-evidence, a correct result, a not clearly wrong, a substantial evidence, a more probable than not, a clear and convincing, or even an overwhelming evidence test. Harmless error is not a device for the appellate court to substitute itself for the trier-of-fact by simply weighing the evidence. The focus is on the effect of the error on the trier-of-fact.

"The question is whether there is a reasonable possibility that the error affected the [sentence]."

202 So. 3d at 68 (citations omitted) (alteration in original) (quoting *State v. DiGuilio*, 491 So. 2d 1129, 1137-38 (Fla. 1986)).[4] Under this standard, our harmless error analyses in the wake of *Hurst* have varied due to the individualized,

---

4. Relatedly, Reynolds contends that the *Hurst* error was harmful because trial counsel would have tried the case differently under the new law. To be sure, attorneys have different considerations to make in the post-*Hurst* landscape. Reynolds's claim, however, amounts to nothing more than pure speculation. Additionally, as demonstrated above, our harmless error review focuses on the effect on the trier of fact—here the jury—not on potential, after-the-fact trial strategy. For these reasons, this portion of Reynolds's claim fails.

case-by-case approach. However, we have conducted these analyses within the same general framework described below.

Preliminarily, we look to whether the jury recommendation was unanimous. *See, e.g.*, *Kaczmar v. State*, 228 So. 3d 1, 9 (Fla. 2017); *Jones v. State*, 212 So. 3d 321, 343-44 (Fla. 2017); *King*, 211 So. 3d at 890; *Davis*, 207 So. 3d at 174-75. Here, the jury recommendation was unanimous. Although Reynolds's jury was instructed that it was "not necessary that the advisory sentence . . . be unanimous," it nonetheless returned two unanimous death sentences. *See Davis*, 207 So. 3d at 174-75. Reynolds attempts to analogize his case to nonunanimous decisions such as *Johnson v. State*, 205 So. 3d 1285 (Fla. 2016). That comparison falls flat. We have been abundantly clear that there is a critical distinction between unanimous and nonunanimous jury recommendations as they pertain to *Hurst* error. *E.g.*, *Davis*, 207 So. 3d at 174 ("[W]e emphasize the *unanimous* jury recommendations of death."). Therefore, Reynolds's case is fundamentally different from any nonunanimous cases where *Hurst* relief was appropriate.

Yet a unanimous recommendation is not sufficient alone; rather, it "begins a foundation for us to conclude beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravators to outweigh the mitigating factors." *King*, 211 So. 3d at 890. Hence, we look to other factors such

as the jury instructions.  *Kaczmar*, 228 So. 3d at 9; *King*, 211 So. 3d at 890-91; *Davis*, 207 So. 3d at 174-75.

A review of the record reveals that the trial court instructed Reynolds's jury using Florida Standard Jury Instruction (Criminal) 7.11.  We have rejected similar *Hurst* claims where defendants received Standard Jury Instruction 7.11.  *Kaczmar*, 228 So. 3d at 9; *Knight v. State*, 225 So. 3d 661, 682-83 (Fla. 2017); *Davis*, 207 So. 3d at 174.  Moreover, a review of *Kaczmar*, *Knight*, and *Davis* demonstrates that the critical instructions given in those cases were similar to those given here. The trial court here instructed the jury, "It is your duty to . . . render to the court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist."  *See Davis*, 207 So. 3d at 174 ("The instructions that were given informed the jury that it needed to determine whether sufficient aggravators existed and whether the aggravation outweighed the mitigation *before* it could recommend a sentence of death.").  Even though Reynolds's jury was instructed that unanimous recommendations were not required at that time, the jury still returned two unanimous death sentence recommendations, similar to the circumstances that we upheld in *Kaczmar*, *Knight*, and *Davis*.  *See Knight*, 225 So. 3d at 683 ("Knight's 'jury was not informed that the finding that sufficient

aggravating circumstances outweighed the mitigating circumstances must be unanimous, and . . . the jury did, in fact, unanimously recommend death.' " (quoting *Davis*, 207 So. 3d at 174-75) (alteration in original)).

Absent from Reynolds's jury instructions was a mercy instruction, which we used to support our harmless error conclusions in *Davis* and *Kaczmar*.[5] Nevertheless, we have held that the failure to give a mercy instruction alone does not necessarily make a *Hurst* error harmful. *Knight*, 225 So. 3d at 683 ("[T]he *Davis* jury 'was instructed that it was not required to recommend death even if the aggravators outweighed the mitigators,' while Knight's jury was not. Nonetheless, we believe that Knight's jury received substantially the same critical instructions as Davis's jury." (citation omitted)). Moreover, in his briefs, Reynolds fails to mention that the mercy instruction was not added to Standard Jury Instruction 7.11 until October 2009—before Davis and Kaczmar's penalty phases but after Reynolds's penalty phase in 2003. *In re Std. Jury Instr. in Crim. Cases–Report No. 2005-2*, 22 So. 3d 17, 22, 35 (Fla. 2009); *Davis*, 207 So. 3d at 155 (penalty phase in 2011); *Kaczmar*, 228 So. 3d at 6 (second penalty phase in 2013). For these reasons, and in accordance with our decisions in *Davis*, *Kaczmar*, and

---

5. The mercy instruction is the portion of Standard Jury Instruction 7.11 that informs a jury that they are "neither compelled nor required to recommend" death. *Perry*, 210 So. 3d at 640.

- 10 -

*Knight*, we can conclude that Reynolds's "jury unanimously made the requisite factual findings to impose death before it issued the unanimous recommendations." *Davis*, 207 So. 3d at 175.

Next, we review the aggravators and mitigators. *See King*, 211 So. 3d at 891-92; *Davis*, 207 So. 3d at 175. Before doing so, however, there is an important distinction between this case and *Davis* that must be addressed: Reynolds waived his right to present mitigation, while Davis did not. At first blush, this may appear problematic, but we have concluded that a defendant's waiver of the right "to present mitigation to the jury during the penalty phase has no bearing" on a cognizable *Hurst* claim. *Jones*, 212 So. 3d at 343 n.3. In *Jones*, we reasoned that the refusal to present mitigation could not give rise to a subsequent *Hurst* claim:

> As previously stated, Jones's waiver of that right was valid, and he "cannot subvert the right to jury factfinding by waiving that right and then suggesting that a subsequent development in the law has fundamentally undermined his sentence." *Mullens v. State*, 197 So. 3d 16, 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 672 (2017).

*Id.* Following the reasoning of *Mullens*, Reynolds—similar to Jones and Mullens—waived his right to jury factfinding on mitigation under the Sixth Amendment. Because he waived that right, he cannot now claim a harmful error for the lack of jury factfinding that he knowingly waived. *See Mullens*, 197 So. 3d at 40. Prior to Reynolds's penalty phase, trial counsel, along with the trial court, attempted to influence Reynolds to reverse his decision and ensured that he was

- 11 -

examined by a mental health expert. *Reynolds II*, 99 So. 3d at 485 n.9, 493-94.

Nonetheless, Reynolds chose to waive his right to present mitigation because he

considered it a "waste of time" as he had no mitigation. *Id.* at 493. Reynolds now

claims that his decision was the result of his belief that he could not convince six

jurors to vote for life and, as trial counsel noted, Reynolds's desire not to "subject

his sisters to the stress of testifying before a jury." Yet the reason that Reynolds

waived mitigation is not pertinent to this analysis under *Mullens* and *Jones*.

Instead, the dispositive fact concerning Reynolds's waiver is that he knowingly

and intelligently waived his right to jury factfinding on mitigation. *See Mullens*,

197 So. 3d at 39-40 ("[W]e fail to see how Mullens, *who was entitled to present*

*mitigating evidence to a jury as a matter of Florida law even after he pleaded*

*guilty and validly waived that right*, can claim error.").

Also, there was not a complete absence of mitigation. Despite his waiver,

the trial court considered Reynolds's limited mitigation. As a result, the trial court

found four mitigators and afforded little weight to each. Furthermore, Reynolds's

waiver was factually less problematic than other waivers that we have upheld. For

instance, in *Kaczmar*, a jury returned an eleven-to-one recommendation for death

after hearing mitigation. 228 So. 3d at 5. However, a second penalty phase jury

returned a unanimous recommendation on remand after the defendant waived

mitigation. *Id.* at 6. Despite this fact, we found the *Hurst* error harmless and

- 12 -

denied relief. *Id.* at 9. It follows that Reynolds's decision to waive mitigation does not constitute a per se harmful *Hurst* error. *See Jones*, 212 So. 3d at 343 & n.3; *Kaczmar*, 228 So. 3d at 9.[6]

Turning back to the comparison between aggravators and mitigators, we have stated that "it must be clear beyond a reasonable doubt that a rational jury would have unanimously found that there were sufficient aggravating factors that outweighed the mitigating circumstances." *Davis*, 207 So. 3d at 174. Here, there were four and five aggravators found in the murders of Robin and Cristina Razor, respectively. Although the trial court found certain mitigating factors, those circumstances could not have affected the jury because Reynolds waived presentation of mitigation to his jury. Even leaving aside the aggravators that could arguably require a factual finding by the jury, the aggravation here necessarily outweighed the mitigation. Consequently, there is no reasonable dispute as to whether the aggravation outweighed the mitigation, and the jury correspondingly returned death recommendations by twelve-to-zero votes.

Finally, we look at the facts of the case. *See King*, 211 So. 3d at 891-92. Here, as Privett relieved himself, Reynolds smashed his head with a cinder block.

---

6. Although Justice Pariente is within her prerogative to continue disagreeing on this point of law, it should be noted that the dissenting position has been soundly rejected by this Court. *See Grim v. State*, No. SC17-1071 (Fla. Mar. 29, 2018); *Jones*, 212 So. 3d at 343 & n.3; *Kaczmar*, 228 So. 3d at 9.

- 13 -

*Reynolds I*, 934 So. 2d at 1135-36, 1157.  Then, Reynolds proceeded to kill

Christina and Robin Razor—an eleven-year-old girl and her mother—by beating

and stabbing them to death because, in Reynolds's words, "with [his] record [he]

couldn't afford to leave any witnesses."  *Id.*  The "egregious facts of this case"

firmly buttress the conclusion that the *Hurst* error was harmless beyond a

reasonable doubt.  *See, e.g.*, *Davis*, 207 So. 3d at 175.

Accordingly, we affirm and conclude that "this is one of those rare cases in

which the *Hurst* error was harmless beyond a reasonable doubt."  *King*, 211 So. 3d

at 890; *see also Knight*, 225 So. 3d at 683; *Davis*, 207 So. 3d at 175.

### Eighth Amendment *Caldwell* Claim

Reynolds also contends that the circuit court erred in denying his successive

motion for postconviction relief pursuant to *Hurst* under the Eighth Amendment.

Specifically, Reynolds argues that his sentences violated the Eighth Amendment

under *Caldwell*.[7]  To date, we have not expressly addressed a *Caldwell* challenge

---

7.  Reynolds asserts two other Eighth Amendment arguments.  The first, that trial counsel would have tried the case differently under the new law, does not merit discussion, as noted above.  *See supra* note 4.  The second, that his indictment failed to list the aggravators, is similarly meritless.  We have "repeatedly rejected the argument that aggravating circumstances must be alleged in the indictment."  *Pham v. State*, 70 So. 3d 485, 496 (Fla. 2011).  Moreover, prior to *Hurst*, we held that "neither *Apprendi* nor *Ring* requires that aggravating circumstances be charged in the indictment."  *Rogers v. State*, 957 So. 2d 538, 554 (Fla. 2007).  It follows that *Hurst* did not impact this settled point of law; therefore, this part of Reynolds's Eighth Amendment claim necessarily fails as well.

to Standard Jury Instruction 7.11 brought under *Hurst*[8]; thus, we must determine if a legal basis exists for these types of "*Hurst*-induced *Caldwell* claims." We have labeled these as *Hurst*-induced *Caldwell* claims because that distills the essence of the challenge: *Hurst* and its progeny render the previous Standard Jury Instruction violative of *Caldwell*.[9]

Relevant Legal Background

As an introductory matter, it is necessary to review the jurisprudential development of this issue, which began in Florida long before *Caldwell*. In *Blackwell v. State*, 79 So. 731 (Fla. 1918), we held that it was reversible error for a prosecutor to make comments that "lessen [a jury's] estimate of the weight of their responsibility, and cause them to shift it from their consciences to the Supreme Court." *Id.* at 736. There, the prosecutor stated, "If there is any error committed in

---

8. Other defendants have raised these claims, which we have rejected without discussion. *See, e.g.*, *Truehill v. State*, 211 So. 3d 930 (Fla.), *cert. denied*, 138 S. Ct. 3 (2017). In light of the dissenting opinions to the denial of certiorari in *Truehill v. Florida*, however, we now explicitly address what has already been implicitly decided.

9. The special concurrence takes issue with our viewing this *Caldwell* claim "through the lens of *Hurst*." Concurring specially op. at 37-38 (Lawson, J.). However, we only view *Caldwell* through the *Hurst* lens here because that is the claim that Reynolds—along with numerous other defendants—raised. As explained in detail below, we agree with the special concurrence that these types of claims categorically fail and improperly use *Caldwell*. This Court, however, must acknowledge the challenge in order to answer it definitively.

- 15 -

this case, the Supreme Court, over in the capital of our state, is there to correct it, if any error should be done." *Id.* at 735. Despite an objection, the trial court refused to correct that statement and expressly approved of it, which we reversed. *Id.* at 735-36. We noted that the "purpose and effect of this remark was to suggest to the jury that they need not be too greatly concerned about the result of their deliberation" because this Court would be waiting in the wings to correct any errors. *Id.*

Years later, in *Pait v. State*, 112 So. 2d 380, 383-86 (Fla. 1959), we reached a similar outcome on analogous facts. Among other statements, the prosecutor there told the jury, "This is the last time the People of this State will try this case in this court. Because whatever you do, the People have no right of appeal. They are done. This is their day. But he may have another day; he has an appeal." *Id.* at 383. We noted that the prosecutor's comment "incorrectly stated the law" and was a type of situation when a statement "so deeply implant[ed] seeds of prejudice or confusion that even in the absence of a timely objection at the trial level it [became] the responsibility of this court to point out the error" and reverse. *Id.* at 384. We concluded that it was impossible for us, as an appellate court, to determine whether the "improper and erroneous" comments persuaded the jury; thus, we could not "say that they were non-prejudicial and harmless." *Id.* at 386.

Taken together, *Blackwell* and *Pait* in some ways represented in Florida what *Caldwell* would become nationally. Some legal commentators have noted as much, "*Blackwell* and *Pait* were *Caldwell* before *Caldwell* was *Caldwell*." Craig Trocino & Chance Meyer, Hurst v. Florida*'s Ha'p'orth of Tar: The Need to Revisit* Caldwell*,* Clemons*, and* Proffitt, 70 U. Miami. L. Rev. 1118, 1134 (2016). One critical distinction, however, is that our cases did not "condemn false prosecutorial [and judicial] statements under the Eighth Amendment analysis employed in *Caldwell*." *Sawyer v. Smith*, 497 U.S. 227, 239 (1990). It is clear that, even in the absence of *Caldwell*, Florida has a long history of ensuring that jurors understand their role and are not misled as to their responsibility. Yet *Caldwell* represented something different than *Blackwell* and *Pait* because it placed the Eighth Amendment imprimatur upon those general principles. *See Sawyer*, 497 U.S. at 238-40; *Caldwell*, 472 U.S. at 328-30.

In *Caldwell*, the Supreme Court ruled that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328-29. On facts nearly identical to *Blackwell*, the Supreme Court took issue with a Mississippi prosecutor's comments to the jury mentioning automatic review by their high court:

> Now, they would have you believe that you're going to kill this man
> and they know—they know that *your decision is not the final*

*decision*. My God, how unfair can you be? *Your job is reviewable.* They know it. . . .

. . . .

. . . They said 'Thou shalt not kill.' If that applies to him, it applies to you, *insinuating that your decision is the final decision* and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up *and that is terribly, terribly unfair*. For they know, as I know, and as Judge Baker has told you, that *the decision you render is automatically reviewable by the Supreme Court*. *Automatically*, and I think it's unfair and I don't mind telling them so.

*Id.* at 325-26 (emphasis added). The Supreme Court reversed the death sentence because the prosecutor "sought to minimize the jury's sense of responsibility," and the Court could not "say that this effort had no effect on the sentencing decision," which did "not meet the standard of reliability that the Eighth Amendment requires." *Id.* at 341. The Court reasoned that shifting a jury's sense of responsibility to appellate courts could create "substantial unreliability as well as bias in favor of death sentences." *Id.* at 330. Such indications to the jury could persuade jurors to rely on appellate courts to correct their errors, therefore completely depriving defendants of their right to a determination of the appropriateness of death due to the nature of appellate review. *Id.* at 330-33.

Justice O'Connor cast the deciding fifth vote in *Caldwell*. Her concurring in part opinion explained a disagreement with the Court's analysis of *California v. Ramos*, 463 U.S. 992 (1983). *Caldwell*, 472 U.S. at 341-43. She wrote,

> In my view, the prosecutor's remarks were impermissible because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility. I agree there can be no "valid state penological interest" in imparting inaccurate or misleading information that minimizes the importance of the jury's deliberations in a capital sentencing case.

*Id.* at 342. According to Justice O'Connor, the Court read *Ramos* too broadly, and she concluded that *Ramos* did not preclude a jury from hearing accurate instructions about postsentencing procedures. *Caldwell*, 472 U.S. at 342. Because the Mississippi Supreme Court applied a presumption of correctness to the jury verdict and could only overturn it under limited circumstances, Justice O'Connor opined that misleading the jury to believe that the appellate court would make the final decision was inaccurate. *Id.* at 342-43. However, she noted that if "a State conclude[s] that the reliability of its sentencing procedure is enhanced by accurately instructing the jurors on the sentencing procedure, including the existence and limited nature of appellate review," then *Ramos* would not "foreclose a policy choice in favor of jury education." *Caldwell*, 472 U.S. at 342.

Following *Caldwell*, the status of Florida jury recommendations as "advisory" was somewhat unsettled. We conclusively held that Florida's sentencing scheme was distinguishable from the procedure at issue in *Caldwell*, that jury recommendations in Florida were "merely advisory," and that it was not a *Caldwell* violation to refer to the jury as "advisory" as long as "the jury's role was adequately portrayed and they were in no way misled as to the importance of their

role." *Pope v. Wainwright*, 496 So. 2d 798, 805 (Fla. 1986). Meanwhile, various opinions from the Eleventh Circuit Court of Appeals questioned our determination. For instance, in *Adams v. Wainwright* (*Adams I*), 804 F.2d 1526 (11th Cir. 1986), *partially vacated and modified sub nom. Adams v. Dugger* (*Adams II*), 816 F.2d 1493 (11th Cir. 1987), *rev'd*, 489 U.S. 401 (1989), the Eleventh Circuit held that *Caldwell* applied to Florida's then-existing sentencing scheme and that certain statements made by a trial court constituted a *Caldwell* violation by creating "an intolerable danger that the jury's sense of responsibility for its advisory sentence was diminished." *Adams I*, 804 F.2d at 1529. In *Combs v. State*, 525 So. 2d 853, 856 (Fla. 1988), we again distinguished the sentencing scheme at issue in *Caldwell*, thus finding *Caldwell* inapplicable in Florida. Moreover, we reiterated our understanding—at the time—that the standard jury instruction referring to the jury's recommendation as "advisory" and the trial court as the final sentencer comported with the death penalty statute and properly described the jury's role. *Combs*, 525 So. 2d at 856-57. We looked to the plain language of the statute to support our conclusion:

>  (2) ADVISORY SENTENCE BY THE JURY.—After hearing all the evidence, the jury shall deliberate and render *an advisory sentence to the court*, based upon the following matters: . . . .

>  (3) FINDINGS IN SUPPORT OF SENTENCE OF DEATH.— Notwithstanding the recommendation of a majority of the jury, *the court*, after weighing the aggravating and mitigating circumstances, *shall enter a sentence* of life imprisonment or death . . . .

- 20 -

*Id.* at 857 (quoting § 921.141(2)-(3), Fla. Stat. (1985)).[10] Further, we stated that it was not our intention to circumvent the clear statutory directive for an advisory jury role when we held that a trial court may override a jury's life sentence only if the "facts are 'so clear and convincing that virtually no reasonable person could differ.' " *Id.* (quoting *Tedder v. State*, 322 So. 2d 908, 910 (Fla. 1975)). We stated much of the same in *Grossman v. State*, 525 So. 2d 833 (Fla. 1988), *receded from on other grounds by Franqui v. State*, 699 So. 2d 1312, 1319-20 (Fla. 1997), and there specifically rejected the argument that *Tedder* created a rule where "the weight given to the jury's advisory recommendation [wa]s so heavy as to make it the de facto sentence." *Id.* at 840. Later, in companion opinions, the Eleventh Circuit found *Caldwell* error in *Mann v. Dugger*, 844 F.2d 1446 (11th Cir. 1988) (en banc), but no error in *Harich v. Dugger*, 844 F.2d 1464 (11th Cir. 1988) (en banc).[11] Those decisions made clear that the Eleventh Circuit at that time focused primarily on whether the comments minimized the jury's sense of responsibility and whether the trial court "sufficiently correct[ed] the impression." *Mann*, 844

---

10. The excerpted language from section 921.141, Florida Statutes, remained substantively unchanged between *Combs* and *Hurst v. Florida*.

11. Judge Tjoflat's special concurrence was actually the Eleventh Circuit's plurality opinion as it pertained to the *Caldwell* issue in *Harich*. *Harich*, 844 F.2d at 1475; *see Davis v. Singletary*, 119 F.3d 1471, 1482 n.5 (11th Cir. 1997).

F.2d at 1456 (quoting *McCorquodale v. Kemp*, 829 F.2d 1035, 1037 (11th Cir. 1987)); *see Harich*, 844 F.2d at 1477-78 (Tjoflat, J., concurring specially).

In the midst of this confusion, the Supreme Court reviewed *Adams II* and issued its decision in *Dugger v. Adams* (*Adams III*), 489 U.S. 401 (1989). In *Adams III*, the Supreme Court did not reach the merits of the *Caldwell* issue, reversing the Eleventh Circuit instead on procedural bar grounds. *Adams III*, 489 U.S. at 407-08, 408 n.4. The Court thus did "not decide whether in fact the jury as instructed in this case was misinformed of its role under Florida law," and left the question open. *Id.* at 408 n.4.

A few years later, the Supreme Court clarified its *Caldwell* holding in *Romano v. Oklahoma*, 512 U.S. 1, 8-10 (1994). There, the defendant was tried separately for two murders. *Id.* at 3. The first trial resulted in a death sentence. *Id.* Evidence of the first death sentence was introduced and considered by the jury in the second trial, which resulted in a second death sentence. *Id.* During appeal of the second trial, the first death sentence was vacated and that case remanded for a new trial. *Id.* at 5. With his second death sentence still on appeal, the defendant argued, in part, that introduction of a prior death sentence undermined the second jury's "sense of responsibility for determining the appropriateness of the death penalty." *Id.* at 3. The Supreme Court disagreed. *Id.* In its analysis, the Court

clarified that Justice O'Connor's position in *Caldwell*, as set forth in her

concurring in part opinion, was controlling over the plurality view there:

> Accordingly, we have since read *Caldwell* as "relevant only to certain
> types of comment—those that mislead the jury as to its role in the
> sentencing process in a way that allows the jury to feel less
> responsible than it should for the sentencing decision." *Darden v.
> Wainwright*, 477 U.S. 168, 184 n.15 (1986). Thus, "[t]o establish a
> *Caldwell* violation, a defendant necessarily must show that the
> remarks to the jury improperly described the role assigned to the jury
> by local law." *Dugger* [*III*], 489 U.S. [at] 407.

*Romano*, 512 U.S. at 9 (first alteration in original). Despite the fact that the first

death sentence was vacated after his second jury considered it as evidence, the

Supreme Court still found that the "infirmity identified in *Caldwell* [wa]s simply

absent in this case: Here, the jury was not affirmatively misled regarding its role in

the sentencing process." *Romano*, 512 U.S. at 9.

In the aftermath of *Romano*, the Eleventh Circuit brought its understanding

of *Caldwell* in line with our interpretation of its application to Florida. *Davis v.

Singletary*, 119 F.3d 1471 (11th Cir. 1997). In *Davis*, the Eleventh Circuit

expressly overruled any implication in *Mann* and *Harich* "that a prosecutorial or

judicial comment or instruction could constitute *Caldwell* error even if it was a

technically accurate description under state law of the jury's actual role." *Id.* at

1482. The court noted that such "implications cannot survive the Supreme Court's

subsequent holdings" in *Romano*. *Davis*, 119 F.3d at 1482. As a result, the

Eleventh Circuit held

- 23 -

that the references to and descriptions of the jury's sentencing verdict in this case as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority are not error under *Caldwell*. Those references and descriptions are not error, because they accurately characterize the jury's and judge's sentencing roles under Florida law.

*Id.* at 1482.

With the relevant history in mind, we now address the claim at issue. The basic argument for such claims follows: after *Hurst*, jury verdicts are no longer advisory and must be unanimous; thus, a jury that was not instructed as such before *Hurst* did not understand its role or feel the weight of its sentencing responsibility. Due to the different considerations for these claims in relation to *Ring*, pre-*Ring* and post-*Ring* claims will be discussed separately.

## Pre-*Ring Caldwell* Claims

After *Romano* and before *Ring*, Florida law was settled that it was not a *Caldwell* error to refer to jury recommendations as "advisory" and the trial court as the final sentencer. *E.g.*, *Card v. State*, 803 So. 2d 613, 628 (Fla. 2001); *Sireci v. State*, 773 So. 2d 34, 40 nn.9 & 11 (Fla. 2000); *Teffeteller v. Dugger*, 734 So. 2d 1009, 1026 (Fla. 1999); *Brown v. State*, 721 So. 2d 274, 283 (Fla. 1998); *Burns v. State*, 699 So. 2d 646, 655 (Fla. 1997); *Johnson v. State*, 660 So. 2d 637, 647 (Fla. 1995); *see also Davis*, 119 F.3d at 1482. Similarly, before *Ring* there was no authoritative indication that there were any constitutional infirmities with Florida's capital sentencing scheme. *See Walton v. Arizona*, 497 U.S. 639, 647-48 (1990),

- 24 -

*abrogated by Ring*, 536 U.S. at 609; *Hildwin v. Florida*, 490 U.S. 638, 639-41 (1989), *abrogated by Hurst v. Florida*, 136 S. Ct. at 623; *Spaziano v. Florida*, 468 U.S. 447, 462-65 (1984), *abrogated by Hurst v. Florida*, 136 S. Ct. at 623; *Proffitt v. Florida*, 428 U.S. 242, 259-60 (1976). Therefore, there cannot be a pre-*Ring*, *Hurst*-induced *Caldwell* challenge to Standard Jury Instruction 7.11 because the instruction clearly did not mislead jurors as to their responsibility under the law; therefore, there was no *Caldwell* violation. *See Romano*, 512 U.S. at 9. The Standard Jury Instruction cannot be invalidated retroactively prior to *Ring* simply because a trial court failed to employ its divining rod successfully to guess at completely unforeseen changes in the law by later appellate courts.

Moreover, *Ring* became the cutoff that we set for any and all *Hurst*-related claims. *Hitchcock v. State*, 226 So. 3d 216, 217 (Fla.), *cert. denied*, 138 S. Ct. 513 (2017); *see, e.g.*, *Asay v. State*, 210 So. 3d 1, 15-22 (Fla. 2016). As a practical matter, a *Hurst*-induced *Caldwell* claim cannot be more retroactive than *Hurst* because the rights announced in *Hurst* serve as the basis for this type of *Caldwell* claim—the two are inextricably intertwined for the purposes of this challenge. If rights are not retroactive prior to *Ring*, then any pre-*Ring* claim based on those rights plainly cannot stand.

Post-*Ring Caldwell* Claims

*Ring* presented the first indication that Florida's then-existing death sentencing scheme may be unconstitutional; so, pre-*Ring* and post-*Ring Hurst*-induced *Caldwell* claims are properly addressed separately. Nevertheless—for these claims—*Ring* amounts to a distinction without a difference. Similar to the discussion above, neither *Ring* nor *Hurst* provides bases for *Caldwell* challenges to the standard jury instruction given in the interim, between 2002 and 2016, because these challenges cannot withstand the Supreme Court's holding in *Romano*. *See* 512 U.S. at 9.

To be sure, following *Ring*, various members of this Court called into question the constitutionality of Florida's death scheme, going so far as to specifically recommend that the standard jury instruction be revised pursuant to *Caldwell* in light of *Ring*. *See, e.g.*, *Bottoson v. Moore*, 833 So. 2d 693, 731-34 (Fla. 2002) (Lewis, J., concurring in result only). Despite this recognition, a majority never conclusively answered *Ring*'s effect on Florida's death scheme. *See Jackson v. State*, 213 So. 3d 754, 781 (Fla. 2017); *Johnson v. State*, 904 So. 2d 400, 406-07 (Fla. 2005) (leaving the question open while denying retroactive application of *Ring* to postconviction defendants). In plurality opinions, *Bottoson* and *King v. Moore*, 831 So. 2d 143 (Fla. 2002), we "concluded that *Ring* did not apply to Florida because the Supreme Court had previously affirmed Florida's

capital sentencing process." *Jackson*, 213 So. 3d at 781. And, "[a]lthough neither *Bottoson* nor *King* constituted majority decisions that represented a clear rule of law from this Court, the ultimate result was that *Ring* was never applied in this State." *Id.* It was not until *Hurst v. Florida* that *Ring* was decisively applied to Florida's sentencing scheme. *Hurst v. Florida*, 136 S. Ct. at 621-22.

Because we never applied *Ring* to Florida's scheme, that case did not change our understanding of the jury's role as advisory and it continued as such.[12] In the meantime, we held that the standard jury instruction neither denigrated the jury's role nor violated *Caldwell* nearly every year between *Ring* and *Hurst v. Florida*. *See, e.g.*, *Davis v. State*, 136 So. 3d 1169, 1201 (Fla. 2014); *Foster v. State*, 132 So. 3d 40, 75 (Fla. 2013); *Patrick v. State*, 104 So. 3d 1046, 1064 (Fla. 2012); *Barwick v. State*, 88 So. 3d 85, 108-09 (Fla. 2011); *Phillips v. State*, 39 So. 3d 296, 304 (Fla. 2010); *Reese v. State*, 14 So. 3d 913, 920 (Fla. 2009); *Jones v. State*, 998 So. 2d 573, 590 (Fla. 2008); *Barnhill v. State*, 971 So. 2d 106, 117 (Fla. 2007); *Miller v. State*, 926 So. 2d 1243, 1257 (Fla. 2006); *Rodriguez v. State*, 919 So. 2d 1252, 1280 (Fla. 2005); *Globe v. State*, 877 So. 2d 663, 673-74 (Fla. 2004); *Griffin*

---

12. In fact, the advisory nature of jury recommendations was the entire point of *Hurst v. Florida*. 136 S. Ct. at 619 ("We hold this sentencing scheme unconstitutional. The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough.").

- 27 -

*v. State*, 866 So. 2d 1, 14 (Fla. 2003).[13]  Therefore, *Romano* applies with equal

force to these post-*Ring Caldwell* claims.  The mere contention that Standard Jury

Instruction 7.11 referred to the jury as "advisory" and the trial court as the final

sentencer cannot constitute a *Caldwell* violation because it fails to "show that the

remarks to the jury improperly described the role assigned to the jury by local

law."  *Romano*, 512 U.S. at 9 (quoting *Adams III*, 489 U.S. at 407).  Florida law, as

it existed between 2002 and 2016, was settled that the standard jury instruction

"fully advise[d] the jury of the importance of its role, correctly state[d] the law,

d[id] not denigrate the role of the jury and d[id] not violate *Caldwell*."  *Patrick*,

104 So. 3d at 1064 (quoting *Jones*, 998 So. 2d at 590).[14]  In *Romano*, despite the

---

13.  Federal courts also agreed with our conclusion in this regard.  *See, e.g.*, *Davis v. Sec'y, Dep't of Corrs.*, No. 8:08-cv-1842-T-33MAP, 2009 WL 3336043 *1, *32 (M.D. Fla. Oct. 15, 2009) ("Because Florida law remains unchanged after *Ring*, and because the standard jury instructions accurately describe the jury role at sentencing under Florida law, there can be no *Caldwell* violation." (citing *Romano*, 512 U.S. at 9)); *see also Belcher v. Sec'y, Dep't of Corrs.*, 427 Fed. App'x 692, 695 (11th Cir. 2011); *Troy v. Sec'y, Dep't of Corrs.*, No. 8:11-cv-796-T30-AEP, 2013 WL 24212, at *1, *45-47 (M.D. Fla. Jan. 2, 2013); *Morris v. Sec'y, Dep't of Corrs.*, No. 8:06-cv-1289-T-27TGW, 2009 WL 3170497, at *1, *38 (M.D. Fla. Sept. 30, 2009).

14.  The dissent's acknowledgement that *this Court* consistently rejected *Caldwell* claims after *Ring* defeats its own argument that *certain justices'* recognition of potential problems somehow renders these *Hurst*-induced *Caldwell* claims cognizable.  *See* dissenting op. at 44-46 (Pariente, J.).  A majority of the Court never recognized these *Caldwell* issues; therefore, juries were not being misled under Florida law.

fact that the first death sentence, which the second jury relied on as evidence, was later vacated, the Supreme Court reasoned that there was no *Caldwell* violation because the "evidence at issue was neither false at the time it was admitted, nor did it even pertain to the jury's role." *Romano*, 512 U.S. at 9. Therefore, a *Caldwell* claim based on the rights announced in *Hurst* and *Hurst v. Florida* cannot be used to retroactively invalidate the jury instructions that were proper at the time under Florida law. *See Romano*, 512 U.S. at 9; *Caldwell*, 472 U.S. at 342-43 (O'Connor, J., concurring in part). *Caldwell*, as interpreted by *Romano*, ensures that jurors understand their actual sentencing responsibility; it does not indicate that jurors must also be informed of how their responsibilities might hypothetically be different in the future, should the law change.[15]

Furthermore, the specific concerns voiced by the Supreme Court in *Caldwell* are curtailed when applied to these *Hurst*-induced *Caldwell* claims. *See Caldwell*, 472 U.S. at 330-33. Specifically, most of the Court's reasoning in *Caldwell* stemmed from the fear that jurors would delegate their sentencing responsibility to

---

15. Justice Pariente's dissent completely fails to address *Romano*, which results in a flawed conclusion. According to the dissent, "it is difficult to understand how Florida's standard jury instructions, following an unconstitutional statute, did not also create constitutional error." Dissenting op. at 44. Occasionally the law is difficult to understand when one ignores the controlling precedent. Here, *Romano* makes it easy to understand that there was no *Caldwell* violation because the standard jury instruction accurately informed juries of their then-existing responsibilities.

appellate courts. *See id.* Conversely, under Florida's previous standard jury instruction, any fear would relate to jurors delegating their responsibility to trial courts rather than appellate courts. Calling the recommendations "advisory" and the trial court as the final sentencer is certainly less problematic than the references to appellate review in *Caldwell*, *Blackwell*, and *Pait* because, unlike appellate courts, trial courts are positioned to make factual findings, which they do every day.[16] While denying the retroactivity of *Ring*, the Supreme Court specifically noted that judicial factfinding is not inherently less reliable than jury factfinding. *See Schriro v. Summerlin*, 542 U.S. 348, 355-56 (2004) ("[F]or every argument why juries are more accurate factfinders, there is another why they are less accurate. . . . When so many presumably reasonable minds continue to disagree over whether juries are better factfinders *at all*, we cannot confidently say that judicial factfinding *seriously* diminishes accuracy."). Of course, we now understand that Florida's prior sentencing scheme is incompatible with the Sixth Amendment, *Hurst v. Florida*, 136 S. Ct. at 619; however, the concerns noted in *Caldwell*—regarding the Eighth Amendment—have less force under these

---

16. Relatedly, we have expressly rejected *Hurst* challenges to death sentences imposed *solely* by trial courts when defendants waived their rights to a penalty phase jury. *E.g.*, *Mullens*, 197 So. 3d at 38-40.

circumstances, and no constitutional infirmity arises because we cannot conclude that there is a risk of death being imposed arbitrarily or capriciously.

Reynolds directs us to our Eighth Amendment discussion in *Hurst*. His argument is relatively straightforward—*Hurst* mandated unanimity in jury sentencing under the Eighth Amendment, which his jury was not instructed on; thus, his jury did not appreciate the significance of its verdict. Yet, this contention misapplies our decision in *Hurst*. *Apprendi*, *Ring*, and *Hurst v. Florida* were Sixth Amendment cases; and *Hurst* was largely the same. As Reynolds indicates, one difference between *Hurst* and those three earlier cases is that we reached an Eighth Amendment issue. 202 So. 3d at 59-63.[17] However, we concluded that the Eighth Amendment requires unanimity in jury sentencing. *Id.* at 59. We did not discuss jury instructions other than to dispel the apprehension that a single holdout juror could derail the administration of a penalty phase. *Id.* at 62-63. *Caldwell* claims are related to, but dissimilar from, the Eighth Amendment issue that we discussed in *Hurst*. As demonstrated above, *Caldwell* claims, limited to a certain extent by

---

17. The special concurrence disputes our "characterization of [*Hurst*] as being compelled by or grounded in the Eighth Amendment." Concurring specially op. at 37. Yet *Hurst* being compelled by or grounded in the Eighth Amendment is not our "characterization" here; it is specifically part of what *Hurst* held and discussed at length. *Hurst*, 202 So. 3d at 59 ("[T]he foundational precept of the Eighth Amendment calls for unanimity in any death recommendation that results in a sentence of death.").

*Romano*, focus on a jury's understanding of the responsibility ascribed to it by law. That is a wholly different matter from whether the Eighth Amendment requires jury factfinding and final verdicts to be unanimous. It follows that our discussion of the Eighth Amendment in *Hurst* is inapposite to the matter at hand.

The distinction between *Hurst*-induced *Caldwell* claims and the actual rights announced in *Hurst* is crucial. Reynolds seeks to conflate the two without any recognition of their significant differences. This approach is problematic because it ignores the Sixth and Eighth Amendment rights to a jury trial that we discussed in *Hurst*. Rather than arguing entitlement to those rights, the claim seeks relief *solely* because Standard Jury Instruction 7.11 in 2003 was not compliant with *Hurst*, a case decided thirteen years later. Under such an approach, the holding, timing, and retroactivity of a later case that changes the law are all irrelevant; and the only determinative question is whether the jury instructions given then would be proper today. But that is not *Caldwell*. This argument stretches *Caldwell* thin—to a breaking point—well beyond its holding that a sentencer cannot be misled "to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 329. Absent limited, unique circumstances,[18] we have granted resentencing to each post-*Ring*, nonunanimous

---

18. *See State v. Silvia*, 235 So. 3d 349 (Fla. 2018).

- 32 -

defendant who has requested *Hurst* relief. For those cases that received a unanimous recommendation, we have individually reviewed the circumstances to ensure that any *Hurst* error did not affect the sentence. *E.g.*, *Davis*, 207 So. 3d at 173-75. In so doing, our constant focus has been on the Sixth and Eighth Amendment rights to a jury trial elucidated in *Hurst*; thus, defendants seeking relief must do so based upon those rights.[19] Moreover, as part of our *Hurst* harmless error analysis, we already review the jury instructions to determine if the instructions actually given affected the sentence. *See Kaczmar*, 228 So. 3d at 9; *King*, 211 So. 3d at 890-91; *Davis*, 207 So. 3d at 174-75. Consistent with our precedent, we reviewed Reynolds's jury instructions and concluded that they did not render his *Hurst* error harmful. *Supra*, pp. 8-11.

Also, acceptance of *Hurst*-induced *Caldwell* claims would produce an absurd result regarding the retroactivity of *Hurst* because for these claims, unlike other types of *Hurst*-related claims, *Ring* is not determinative. *See supra* pp. 26-28; *cf. Asay*, 210 So. 3d at 15-22. As demonstrated, jury recommendations in Florida under the previous sentencing scheme were advisory both pre- and post-*Ring*. To invalidate Standard Jury Instruction 7.11, despite the fact that it

---

19. Our discussion in this case is limited to *Hurst*-induced *Caldwell* claims against Standard Jury Instruction 7.11. Obviously, this opinion does not affect proper *Caldwell* challenges.

accurately described the jury's role as advisory, would ignore *Romano* while

allowing *Caldwell* claims to swallow retroactivity whole.  Such a holding, in

effect, would make *Hurst* completely retroactive purely because the pre-*Hurst*

standard jury instruction did not—and could not—reflect *Hurst*.  This outcome

would effectively add a fourth prong to the *Witt*[20] retroactivity test that we

employed in *Mosley* and *Asay*: whether the jury instructions given accurately

predicted the change in law.  *See Mosley*, 209 So. 3d at 1276-83; *Asay*, 210 So. 3d

at 15-22.  As already explained, the result advanced by Reynolds becomes

particularly circuitous when applied to pre-*Ring Caldwell* claims.  *See supra* p. 25.

*Hurst* does not apply to pre-*Ring* cases.  *E.g.*, *Hitchcock*, 226 So. 3d at 217.  Thus,

the rights announced in *Hurst* are inapplicable pre-*Ring*.  *Id.*  Regardless, as the

argument goes, even pre-*Ring* juries were being misled as to their responsibility in

sentencing notwithstanding the fact that such a responsibility did not exist then and

does not exist retroactively.  This is the exact unwieldiness of *Caldwell* that

*Romano* averts.  Either juries were being misled or they were not.  We conclude

that they were not.

Finally, these *Hurst*-induced *Caldwell* claims rest upon a simple, albeit

conclusory, premise which Reynolds clearly stated: "The chances that at least one

---

20.  *Witt v. State*, 387 So. 2d 922 (Fla. 1980).

- 34 -

juror would not join a death recommendation if a resentencing were now conducted are likely given that proper *Caldwell* instructions would be required"; thus, the unanimous recommendation does not meet the Eighth Amendment's reliability requirement. To be sure, this notion is unsubstantiated. But it is further weakened by the fact that juror unanimity was not required under Florida's previous death scheme, so a converse argument could be made. Any juror that had any doubt whatsoever could vote for a life sentence without feeling any responsibility for leniency towards the individual found guilty of first-degree murder. Of course, under the previous scheme, the other jurors who voted for death had no incentive to pressure a holdout juror because only a bare majority was required. Before *Hurst*, jurors had various options for recommendations, including life, 7-to-5 death, 8-to-4 death, 9-to-3 death, 10-to-2 death, 11-to-1 death, and unanimous death outcomes. Now, the sentencing verdict is binary—life or death. Therefore, cases that previously received nonunanimous death recommendations may become unanimous death verdicts. This has already occurred. On March 23, 2017, we granted *Hurst* relief due to an *eight-to-four death jury recommendation*, sending Randall Deviney back for resentencing. *Deviney v. State*, 213 So. 3d 794, 794-95 (Fla. 2017). Deviney has already been resentenced to death by a

*unanimous jury verdict*.[21]  Plainly, the entire rationale beneath these *Hurst*-induced

*Caldwell* claims is on uneven footing.  We assume that jurors will follow the

instructions given to them.  *Crain v. State*, 894 So. 2d 59, 70 (Fla. 2004).

Accordingly, we will not guess at whether or not individual jurors before *Hurst*

were voting for the death of another person haphazardly after being instructed by

the trial court not to "act hastily or without due regard to the gravity of these

proceedings" and to realize "that a human life is at stake."  *See* Fla. Std. Jury Instr.

(Crim.) 7.11.

Accordingly, we conclude that *Hurst*-induced *Caldwell* claims against the

standard jury instruction do not provide an avenue for *Hurst* relief.

This Case

Based on the foregoing, we conclude that the circuit court properly denied

Reynolds's Eighth Amendment *Caldwell* claim.  Reynolds received Standard Jury

Instruction 7.11, and his jury was not misled as to its role in sentencing.  *See*

*Romano*, 512 U.S. at 9.  Although not necessary, further supporting our conclusion

is the fact that the trial court gave a *Tedder* instruction, stating that it could reverse

the jury recommendation "only if the facts [were] so clear and convincing that

---

21. *Man Gets Death Sentence Again for Killing Neighbor*, Chi. Trib., Oct. 14, 2017, http://www.chicagotribune.com/news/sns-bc-fl--death-penalty-hearing-20171014-story.html.

virtually no reasonable person could differ." *See Tedder*, 322 So. 2d at 910. In accordance with our general holding pertaining to *Hurst*-induced *Caldwell* claims and the actual jury instructions given to Reynolds's jury, we can conclude beyond a reasonable doubt that the jury was properly instructed under the existing law in a manner that underscored "their power to determine the appropriateness of death as an 'awesome responsibility.' " *See Caldwell*, 472 U.S. at 330 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 320 (1976)).

## CONCLUSION

Accordingly, we affirm the circuit court's denial of Reynolds's motion for postconviction relief.

It is so ordered.

LABARGA, C.J., and LEWIS, J., concur.
LAWSON, J., concurs specially with an opinion.
CANADY and POLSTON, JJ., concur in result.
PARIENTE, J., dissents with an opinion.
QUINCE, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LAWSON, J., concurring specially.

I concur in the majority's decision. *See Okafor v. State*, 225 So. 3d 768, 775-76 (Fla. 2017) (Lawson, J., concurring specially). I write briefly, however, to explain why I disagree with the majority's characterization of *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017), as being compelled by

or grounded in the Eighth Amendment's prohibition on cruel and unusual punishment and why the majority is wrong to view Reynolds' Eighth Amendment claim pursuant to *Caldwell v. Mississippi*, 472 U.S. 320 (1985), through the lens of *Hurst*.

Florida's Constitution unambiguously mandates that this Court interpret "[t]he prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment . . . in conformity with the decisions of the United States Supreme Court," art. I, § 17, Fla. Const., which has held that the Eighth Amendment does not require jury sentencing in capital cases. *See Spaziano v. Florida*, 468 U.S. 447, 464-65 (1984), *overruled on other grounds by Hurst v. Florida*, 136 S. Ct. 616, 624 (2016) (overruling *Spaziano* on *Sixth Amendment grounds* to the extent it "allow[s] a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty").

In light of *Spaziano*, a faithful application of the Florida Constitution prohibits grounding *Hurst* in the Eighth Amendment and, therefore, necessarily prohibits using *Hurst* to create the *Caldwell* Eighth Amendment capital sentencing problem that the majority opinion purports to solve. *See* majority op. at 14-37. Because the "Hurst-induced *Caldwell* claim" coined by the majority is not cognizable as a matter of law, analyzing a procedurally barred *Caldwell* claim in

- 38 -

light of *Hurst* is not an exercise that I would—or that this Court should—undertake. *See also Owen v. State*, 773 So. 2d 510, 515 n.11 (Fla. 2000) ("[T]his Court has repeatedly held that *Caldwell* errors cannot be raised on collateral review.").

PARIENTE, J., dissenting.

For the reasons fully explained in my dissenting opinion in *Grim v. State*, No. SC17-1071 (slip op. Fla. Mar. 29, 2018), at 3-11, because the jury did not hear any evidence of mitigation, I would conclude that this Court cannot rely on the jury's unanimous recommendations for death in Reynolds' case to determine that the *Hurst*[22] error is harmless beyond a reasonable doubt. Per curiam op. at 14. Because *Hurst* applies retroactively to Reynolds' sentences of death, which became final in 2007, the dispositive issue in this case is whether the *Hurst* error is harmless beyond a reasonable doubt. *Hurst*, 202 So. 3d at 68-69; *see Mosley v. State*, 209 So. 3d 1248, 1283-84 (Fla. 2016); *Davis v. State*, 207 So. 3d 142, 174-75 (Fla. 2016). I also write to explain that Reynolds' *Caldwell*[23] claim, brought in light of *Hurst,* has merit because the jury instructions used in Reynolds' trial misled the jury as to its role in capital sentencing.

---

22. *Hurst v. State* (*Hurst*), 202 So. 3d 40 (Fla. 2016), *cert. denied*, 137 S. Ct. 2161 (2017); *see Hurst v. Florida*, 136 S. Ct. 616 (2016).

23. *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

**Whether the *Hurst* Error Is Harmless Beyond a Reasonable Doubt**

After being convicted of two counts of first-degree murder, Reynolds "waived his right to present mitigating evidence." *Reynolds v. State* (*Reynolds I*), 934 So. 2d 1128, 1138 (Fla. 2006); *see* per curiam op. at 2. As the per curiam opinion explains, "[t]rial counsel swore in an affidavit that Reynolds waived mitigation, 'at least in part, because he did not think there was any chance of convincing six jurors to vote for life, and did not want to subject his sisters to the stress of testifying before a jury.' " Per curiam op. at 2-3. After hearing only evidence of aggravation, the penalty phase jury "returned unanimous recommendations of death for both first-degree murder convictions." *Reynolds I*, 934 So. 2d at 1138.

After the penalty phase, the trial court held a *Spencer*[24] hearing, where "the sole testimony presented by the defense was the testimony of Reynolds himself. The State did not present any testimony, relying solely on the evidence and testimony admitted during the guilt and penalty phase trials as support for the aggravating factors." *Reynolds I*, 934 So. 2d at 1138. Acknowledging Reynolds' mitigation waiver, the trial court determined that the aggravating factors

---

24. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

outweighed the mitigation and sentenced Reynolds to death for both first-degree

murder convictions. *Id.*[25]

As to the mitigation that the jury did not hear before making its sentencing

recommendations, the trial court found the following statutory mitigating

circumstances for both murders: (1) Reynolds was gainfully employed; (2)

Reynolds manifested appropriate courtroom behavior throughout trial; (3)

Reynolds cooperated with law enforcement; and, (4) Reynolds had a difficult

childhood. *Id.* at 1138-39; *see* per curiam op. at 4. In finding that Reynolds had a

difficult childhood, the trial court noted that Reynolds "suffered from an

upbringing marked by physical and psychological abuse"; his "father was a chronic

alcoholic"; his "mother was chronically ill and was often hospitalized during [his]

---

25. The trial court found the following aggravating factors for the murder of Robin Razor and assigned them the noted weight: (1) Reynolds had previously been convicted of a another capital felony or a felony involving a threat of violence to the person (PVF) (great weight); (2) Reynolds committed the murder while he was engaged in or was an accomplice in the commission of or an attempt to commit a burglary of a dwelling (great weight); (3) the murder was committed for the purpose of avoiding a lawful arrest (great weight); and (4) the murder was committed in an especially heinous, atrocious, or cruel fashion (HAC) (great weight). *Reynolds I*, 934 So. 2d at 1138.

For the murder of Christina Razor, the trial court the following five aggravating factors and assigned them the noted weight: (1) PVF (great weight); (2) Reynolds committed the murder while he was engaged in or was an accomplice in the commission of or an attempt to commit a burglary of a dwelling (great weight); (3) the murder was committed for the purpose of avoiding a lawful arrest (great weight); (4) HAC (great weight); and (5) the victim of the murder was a person less than 12 years of age (great weight). *Id.*

childhood"; Reynolds "was regularly hit, slapped and kicked by his drunken father, without warning"; his father would sometimes pour ice water on him in the middle of the night; Reynolds "regularly cared for his disabled, wheelchair-bound sister because his mother was unable to do so"; he "helped run household affairs around the home"; his mother died when he was 17 years old; his education was limited to the tenth grade; Reynolds began using alcohol at the age of 14; and, he "had essentially no adult supervision as a child." Second Am. Sentencing Order ("SO"), at 14-15, 26-27.

Pursuant to this Court's opinion in *Muhammad v. State*, 782 So. 2d 343, 361-62 (Fla. 2001), the trial court in this case properly did "not give the recommendation[s] of the jury great weight." SO, at 16; *see* per curiam op. at 4. However, as I fully explained in my dissenting opinion in *Grim*, this does not overcome the *Hurst* error—the absence of a unanimous jury finding that the aggravation in Reynolds' case outweighed the mitigation. *See Hurst*, 202 So. 3d at 44.

Significantly, Florida's pre-*Hurst* capital sentencing scheme, which required only seven jurors to recommend a sentence of death, guided Reynolds' calculation for waiving mitigation. Per curiam op. at 2-3. However, we now know that the United States and Florida Constitutions require all twelve jurors to vote for death. *Hurst*, 202 So. 3d at 44. Therefore, Reynolds' calculation for waiving the right to

present evidence of mitigation to the jury would be starkly different in proceedings guided by our post-*Hurst* capital sentencing statute—requiring only one juror to vote for life. *See Kaczmar v. State*, 228 So. 3d 1, 16 (Fla. 2017) (Pariente, J., concurring in part and dissenting in part); *see also* § 921.141, Fla. Stat. (2017). Thus, in light of Reynolds' mitigation waiver, I cannot rely on the jury's uninformed, albeit unanimous, recommendations for death to determine that the *Hurst* error is harmless beyond a reasonable doubt.

Next, I turn to address the per curiam opinion's discussion of Reynolds' claim to a right to relief under *Hurst* pursuant to the United States Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320 (1985)—what the per curiam opinion labels a "*Hurst*-induced *Caldwell* claim." Per curiam op. at 15; *see* concurring specially op. at 38 (Lawson, J.). As the per curiam opinion acknowledges, although this claim has been raised by numerous defendants, this Court has not "expressly addressed" the merits of this claim. Per curiam op. at 14 & n.8.

### *Caldwell* Claim

This Court made clear in *Hurst*, which is now final, that, in addition to the constitutional requirements of the Sixth Amendment, "juror unanimity in any recommended verdict resulting in a death sentence is required under the Eighth Amendment." 202 So. 3d at 59. *Hurst* also provided the constitutional

requirements for imposing capital sentences in a manner that is not arbitrary and furthers the "narrowing function required by the Eighth Amendment." *Id.* at 60. Therefore, contrary to both the per curiam opinion and Justice Lawson's concurring specially opinion, I would conclude that Reynolds' *Caldwell* claim is valid. *Cf.* concurring specially op. at 37-38 (Lawson, J.).

In *Caldwell*, the United States Supreme Court held that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests *elsewhere*." 472 U.S. at 328-29 (emphasis added). As to the pre-*Hurst* jury instructions, I explained in *Hamilton v. State*, 43 Fla. L. Weekly S82 (Fla. Feb. 8, 2018):

> Florida's pre-*Hurst* jury instructions referred to the advisory nature of the jury's recommendation over a dozen times. Further, the jury was only required to make a recommendation between life or death to the trial court, which then held the ultimate responsibility of making the requisite factual findings and determining the appropriate sentence. Thus, it was made abundantly clear to the jury that they were not responsible for rendering the final sentencing decision.

*Id.* at S84 (Pariente, J., dissenting) (citations omitted). Similar to how a majority of this Court denied the applicability of *Ring v. Arizona*, 536 U.S. 584 (2002), to Florida's capital sentencing scheme,[26] this Court consistently determined that

---

26. *See Bottoson v. Moore*, 833 So. 2d 693, 695 (Fla. 2002); *King v. Moore*, 831 So. 2d 143, 144-45 (Fla. 2002).

*Caldwell* did not compromise the validity of Florida's jury instructions—even after *Ring*. Per curiam op. at 19-24.

However, if Florida's capital sentencing scheme was invalid from the point that the United States Supreme Court decided *Ring*, as the United States Supreme Court made clear in *Hurst v. Florida*, 136 S. Ct. at 622, and this Court's retroactivity analyses confirm,[27] it is difficult to understand how Florida's standard jury instructions, following an unconstitutional statute, did not also create constitutional error. *See* per curiam op. at 28 & n.15. Indeed, in a concurring in result only opinion in *Bottoson v. Moore*, 833 So. 2d 693 (Fla. 2002), Justice Lewis argued that, "in light of the dictates of *Ring v. Arizona*, it necessarily follows that Florida's standard penalty phase jury instructions may no longer be valid and are certainly subject to further analysis under" *Caldwell*. *Bottoson*, 833 So. 2d at 731 (Lewis, J., concurring in result only). Justice Lewis explained:

> [I]n light of the decision in *Ring v. Arizona*, it is necessary to reevaluate both the validity, and, if valid, the wording of [Florida's standard capital] jury instructions. The United States Supreme Court has defined the reach of *Caldwell* by stating that "*Caldwell* is relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright*, 477 U.S. 168 (1986). . . . Clearly, under *Ring*, the jury plays a vital role in the determination of a capital defendant's sentence through the determination of aggravating factors. *However, under Florida's standard penalty phase jury instructions, the role of the jury*

---

27. *See Asay v. State* (*Asay V*), 210 So. 3d 1, 15-22 (Fla. 2016), *cert. denied*, 138 S. Ct. 41 (2017); *Mosley*, 209 So. 3d at 1276-83.

*is minimized, rather than emphasized, as is the necessary implication to be drawn from* Ring.

Under Florida's standard penalty phase jury instructions, the jury is told, even before evidence is presented in the penalty phase, that its sentence is only advisory and the judge is the final decisionmaker. The words "advise" and "advisory" are used more than ten times in the instructions, while the members of the jury are only told once that they must find the aggravating factors beyond a reasonable doubt. The jury is also instructed several times that its sentence is simply a recommendation. *By highlighting the jury's advisory role, and minimizing its duty under Ring to find the aggravating factors, Florida's standard penalty phase jury instructions must certainly be reevaluated under* [Caldwell].

Just as the high Court stated in *Caldwell*, Florida's standard jury instructions "minimize the jury's sense of responsibility for determining the appropriateness of death." *Caldwell*, 472 U.S. at 341. *Ring* clearly requires that the jury play a vital role in determining the factors upon which the sentencing will depend, and Florida's jury instructions tend to diminish that role and could lead the jury members to believe they are less responsible for a death sentence than they actually are.

*Id.* at 732-33 (emphasis added) (citations omitted).

Of course, *Hurst v. Florida* held that Florida's existing capital sentencing law was unconstitutional under *Ring*, and the jury's proper role in capital sentencing is far more significant than the pre-*Hurst* statutory scheme and jury instructions provided. *See Hurst v. Florida*, 136 S. Ct. at 622. It follows that the jury instructions following the unconstitutional scheme, which minimized the jury's role in capital sentencing, were likewise deficient.

Not only was the jury in Reynolds' case apprised only of information that aggravated Reynolds' crime, the jury was repeatedly told that its sentencing

- 46 -

recommendation between life and death was merely "advisory." In fact, in instructing the jury, the trial judge explicitly stated that "the final decision as to what punishment shall be imposed is the responsibility of the judge." Per curiam op. at 3. Therefore, because *Hurst* applies retroactively to Reynolds' sentence of death, I would conclude that *Caldwell* further supports the conclusion that the *Hurst* error in Reynolds' case is not harmless beyond a reasonable doubt.

### Conclusion

The greatest concern in capital sentencing is ensuring that the death penalty is not imposed arbitrarily or capriciously. For all the reasons explained above, I cannot conclude that the *Hurst* error in Reynolds' case is harmless beyond a reasonable doubt. Thus, I would grant Reynolds a new penalty phase.

Accordingly, I dissent.

QUINCE, J., dissenting.

As I have stated previously, "[b]ecause *Hurst* requires 'a jury, not a judge, to find each fact necessary to impose a sentence of death,' the error cannot be harmless where such a factual determination was not made." *Hall v. State*, 212 So. 3d 1001, 1036-37 (Fla. 2017) (Quince, J., concurring in part and dissenting in part) (citation omitted) (quoting *Hurst v. Florida*, 136 S. Ct. 616, 619 (2016)). I am even more troubled in a case such as this one, where the defendant waived his right

to present mitigation to avoid subjecting his sisters to the stress of testifying when he felt it was highly unlikely he would convince six jurors to vote for life.

I agree with Justice Pariente's viewpoint that our *Hurst* jurisprudence affects a defendant's calculus in determining whether to present mitigation. I accordingly cannot agree with the majority that the *Hurst* error in this case is harmless beyond a reasonable doubt. Accordingly, I dissent.

An Appeal from the Circuit Court in and for Seminole County,
Kenneth R. Lester, Jr., Judge - Case No. 591998CF003341A000XX

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel, Julissa R. Fontán, Maria E. DeLiberato, and Chelsea Shirley, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Doris Meacham, Assistant Attorney General, Daytona Beach, Florida,

for Appellee